## In re COORDINATED PRETRIAL PROCEEDINGS IN ANTIBIOTIC ANTITRUST ACTIONS.*

United States District Court,
D. Minnesota,
Fourth Division.

May 1, 1975.

See also, D.C., 410 F.Supp. 704.

---

* Consolidated with:

*Doughboy Industries, Inc. v. American Cyanamid Co.,* 4–68 Civ. 409; and the following actions: 4–71 Civ. 421, 426, 433, 430, 425, 434, 424, 428, 395, 392, 423, 4–68 Civ. 411, 4–71 Civ. 422, 4–68 Civ. 410, 4–71 Civ. 432, and 400.

Cochrane & Bresnahan, St. Paul, Minn., Chestnut, Jones, Brooks, Kennedy & Burkard and Chestnut, Brooks & Burkard, P. A., Minneapolis, Minn., Crane, Martin, Claussen, Hamilton & Barry, Topeka, Kan., Foley, Lardner, Hollabaugh & Jacobs, Washington, D. C., Anderson, Granger, Nagels & Lastelic and John Anderson, Jr., Overland Park, Kan., Hamrick & Hamrick, Rutherfordton, N. C., Joyner & Howison, Raleigh, N. C., Jack M. McCann, Waverly, Ohio, Graham & Graham, Zanesville, Ohio, H. Derrell Dickens, El Dorado, Ark., John W. Elrod, Rison, Ark., Brown, Compton & Prewett, El Dorado, Ark., Ferguson & Burdell, Seattle, Wash., Shea, Gallop, Climenko & Kramer, New York City, Beddow, Embry & Beddow, Birmingham, Ala., Doherty, Rumble & Butler, St. Paul, Minn., Lee Johnson, Atty. Gen., of the State of Oregon, Salem, Ore., Law Office of Joseph L. Alioto, San Francisco, Cal., for Doughboy Committee Counsel.

## MEMORANDUM APPROVING PLAN OF DISTRIBUTION AND ATTORNEYS FEES

MILES W. LORD, District Judge.

This matter comes before the Court upon motion of the "Doughboy Committee of Counsel" for the Court to accept the plan of distribution recommended by the Committee of Counsel and to distribute the "Doughboy Settlement Fund" to certain class claimants. Also before the Court are some sixteen petitions for attorneys fees and allowances from various lawyers representing the class.

1. *HISTORY OF THE ACTION*: The *Doughboy* action is one of the many class actions and class action settlements involved in the *In Re Antibiotic Antitrust Actions*, 4–71–Civ. 435 and M19–93A. A history of these actions and of this particular settlement, is contained in the opinions of this Court and of the Court for the Southern District of New

York, and also in the opinions of the Court of Appeals for the 2nd and 8th Circuits. This Court does not intend to fully review the history of all the tetracycline cases, nor the settlement of the *Doughboy* action. That history can be found in this Court's "Memorandum Opinion Approving Settlement" in the *Doughboy* class action, dated February 11, 1974. For the uninitiated, however, a brief review of the *Doughboy* class action follows.

The *Doughboy* action is one of three "farm actions, or agricultural actions" involved in the overall tetracycline litigation. The first suit in the *Doughboy* class action was filed in 1968 in the District of Minnesota by the law firms of Chestnut, Brooks & Burkard and Cochrane & Bresnahan, *Doughboy Industries, Inc., et al. v. American Cyanamid Company, et al.*, 468 Civ. 409. (*Doughboy*)[1] That particular suit, and subsequent ones filed in this district and throughout the United States, alleged, in essence, that Defendants had conspired to monopolize, and did monopolize, foreign and domestic commerce in the sale of broad spectrum antibiotics for *non-human use*. The complaint in that suit further alleged that Defendants conspired to, and in fact did, restrain trade among the several states in the market for broad spectrum antibiotics for *non-human use*.

When the *Doughboy* action was filed, certain actions were pending in the Southern District of New York, including a criminal case brought by the United States Government and private civil cases for treble damages brought on behalf of purchasers of broad spectrum antibiotics for human use. To the Court's knowledge, the *Doughboy* action was the first class action filed involving the agricultural market, or non-human use market.

Besides alleging violations of the antitrust laws of the United States, the

---

1. On the same day the *Grange Co. et al. v. American Cyanamid et al. (Grange)* and the *Minnesota Fur Foods Cooperative et al. v.* *American Cyanamid et al. (Minnesota Fur Foods)* were filed by the same firms in the District of Minnesota.

*Doughboy, Grange* and *Minnesota Fur Foods* cases alleged a national class of all persons, firms or corporations engaged in the production, manufacture, formulation and use of feeds, fodders, forages, supplements and medications used in the agriculture, livestock, poultry and allied industries for the feeding and growing of livestock, poultry and animals, whose principal offices were located throughout the United States of America, its possessions and territories, and who had purchased broad spectrum antibiotics and sustained damages as a result thereof.

On January 28, 1969, an Order to Show Cause why the *Doughboy, Grange, Minnesota Fur Foods,* and certain other agricultural cases, should not be transferred to the Southern District of New York, before the Honorable Inzer B. Wyatt, was issued by the Judicial Panel on Multi-District Litigation. On April 3, 1969, the Judicial Panel ordered these agricultural cases to be so transferred.

Prior to transfer of the cases, certain settlement negotiations were conducted. Counsel for the class have stated that initially they were offered $200,000 for the "nuisance value" of the case.

On February 6, 1969, while approximately 140 actions were pending before Judge Wyatt, defendants made a global settlement offer, in an attempt to settle most or all of the cases. In essence, this settlement offer was made to the fifty states, to private non-profit hospitals, to certain hospital insurers, to retail and wholesale pharmaceutical houses, and others. The agricultural cases were *not* included in the settlement offer.

The original amount offered was $120,000,000.00. During these settlement talks, there was some discussion as to whether or not the agricultural plaintiffs were included in the global settlement offer. It finally was concluded and agreed by all parties that the agricultural cases were *not* included in the global settlement offer.

On June 24, 1970, Judge Wyatt approved the final settlement of approximately 100 of the cases then pending

before him in the antibiotics litigation. *State of West Virginia v. Chas. Pfizer & Company, Inc., et al.,* 314 F.Supp. 710 (S.D.N.Y.1970). The settlement was rejected by seven states, private non-profit hospitals and a few others. Judge Wyatt's approval of the settlement left him with approximately forty to fifty litigating cases.

On February 24, 1970, Judge Wyatt issued Pretrial Order No. 1, which ordered defendants to establish a document depository for discovery purposes, and also created the Plaintiffs' National Steering Committee (PNSC). The PNSC was broken down into three large subcommittees: (a) a Government Committee, which included the seven non-settling states, and the United States Government, (b) a Miscellaneous Committee consisting of private insurance companies, union health and welfare funds, competitors and foreign governments, and (c) a Farm Committee, consisting of all the cases involving broad spectrum antibiotics for non-human use.

The PNSC elected John Cochrane, Esq., co-counsel in the *Doughboy* action, as its chairman. Once the committee was organized, various subcommittees for discovery, briefing, etc., were created and began to prepare the cases for trial.

Throughout this Court's opinions, one finds many references to the Plaintiffs' National Steering Committee. The Court has seldom seen such a large group of prominent plaintiffs' antitrust lawyers, often with differing goals and ideas, work in such great harmony and unison. It is the Court's opinion that the leadership of that committee, plus the strength and cohesiveness with which it bound itself together over the years, was one of the primary factors in achieving the $78,000,000.00 worth of settlements which have occurred since its inception, in the "non-settling" cases.

The Plaintiffs' National Steering Committee proceeded with discovery in New York, including review of the documents which were being deposited in the Document Depository.

Because of the tremendous burden placed upon Judge Wyatt in administering the settlement covering 43 states and certain other classes, the Judicial Panel on Multi-District Litigation, with the consent and recommendation of Judge Wyatt, transferred the non-settling cases to the undersigned Judge on December 2, 1970. *In re Antibiotic Drugs Antitrust Litigation,* 320 F.Supp. 586, (Jud. Pan.Mult.Lit., 1970). In 1971, these actions were transferred, pursuant to 28 U.S.C. § 1404(a), to the District of Minnesota for the completion of pretrial proceedings and for trial. *In re Antibiotic Drug Antitrust Litigation,* 333 F.Supp. 309 (S.D.N.Y. 1971). Pretrial Order No. 1, with some modification, remained in effect. The Plaintiffs' National Steering Committee, with John Cochrane, Esq. as chairman, marched on with discovery.

In January of 1971, this Court established three national class actions. *E. J. Hoffert, et al. v. American Cyanamid Company, et al.,* was approved as a national class action on behalf of doctors of veterinary medicine who purchased broad spectrum antibiotics for non-human use. See e. g. Class Action Order 71–2, January 15, 1971. By Class Action Order 71–3 of January 21, 1971, it was determined that *Doughboy Industries, Inc., et al. v. American Cyanamid Company, et al.,* should proceed as a national class action, with the plaintiffs in that action as the class representatives for all:

> "2 . . . Persons or entities located in the United States or the Commonwealth of Puerto Rico who, during the periods covered by the complaints herein:
>
> a) Purchased for manufacture or use broad spectrum antibiotics or broad spectrum antibiotic products for non-human use directly from the defendants; and/or
>
> b) Purchased for manufacture or use, but not for the purpose of resale, broad spectrum antibiotics or broad spectrum antibiotic products for non-human use from wholesal-

ers, including distributors and subjobbers, in the same form as originally sold by the defendants."

The third national class action, *Midwest Veterinary Supply, et al. v. American Cyanamid Company, et al.,* was designated as a class representing wholesalers of broad spectrum antibiotic products for non-human use.

In the case at bar, the *Doughboy* action, 17,790 notices were mailed to potential class members, pursuant to Rule 23, F.R.Civ.P. In addition, notice of the formation of the *Doughboy* class was published in eleven farm periodicals. The notice was of the opt-out type, and provided for intervention by class members, and representation by their own attorneys, if desired. Class Action Order No. 71–3, establishing the *Doughboy* class action, also appointed a Doughboy Committee of Counsel for the national class.

After the notices were sent out and the opt-outs were received, discovery continued in a hard and fast manner. Interrogatories were prepared by both sides, served and answered. Over 400 depositions were taken. A large number of these depositions related directly to the farm cases, while others related to the liability aspects of all the cases. Many depositions covering only the *Doughboy* action were also taken. In all, several joint sets of interrogatories were served upon defendants by the Plaintiffs' National Steering Committee.

By this time, the number of documents deposited in the Document Depository was passing the million mark, and the number upon which privilege was claimed was growing daily. As a consequence, the Court appointed three Special Masters to hear argument, review documents upon which privilege was claimed, and recommend rulings to the Court. Both sides were charged for the expenses of the Masters, with the Farm Committee's counsel contributing their fair share. Arguments of a prima facie showing of fraud or tort upon the patent office were argued as against defendants

American Cyanamid Company, Pfizer, Inc., and Bristol-Myers Company before the Masters. The Masters ruled upon these motions, finding a prima facie showing of fraud before the patent office, thereby abrogating much of the work product and attorney-client privilege.

From 1971 to the date of the settlements, work went on at a rapid pace. Many pretrial conferences were held, and on six different occasions, rulings of this Court were appealed through mandamus; documents continued to be produced, copied and filed, and trial briefs were being prepared.

It is impossible in this short opinion to acquaint the unfamiliar with the tremendous magnitude and complexity of this case. Defense counsel had been, and still are, excellent, competent, hard working and resourceful. They fought ably every inch of the way.

On September 20, 1973, the *Doughboy* Committee of Counsel signed a Memorandum of Agreement with the defendants. This settlement was a joint settlement with the *Hoffert* class action. All of the members of the *Hoffert* Committee of Counsel are members of the *Doughboy* Committee of Counsel. In essence, this settlement called for the payment of $35,000,000.00, plus an amount equal to one year's interest at the rate of 9% per annum for full and final settlement of these two class actions. The settlement funds when deposited, totaled slightly over $38,000,000.00.

The settlement agreement also encompassed those individuals who purchased broad spectrum antibiotics or broad spectrum antibiotic products for resale at retail for non-human use, thus expanding the original *Doughboy* class definition. The defendants denied, and still do deny any liability, notwithstanding the settlement. Notice of the settlement was sent to approximately 17,263 *Doughboy* class members. In addition, the notice of the settlement was again published in the same trade journals. In addition to the original 17,263 *Doughboy* notices, 32,708

notices were sent to farm retailers, explaining that they might participate in the settlement, and further that they might appear and object. The hearing to determine the fairness and adequacy of the proposed settlement was held December 28, 1973. No objectors appeared. On February 11, 1974, the Court issued its Memorandum Opinion Approving Settlement in the *Doughboy* and *Hoffert* cases. A settlement of the *Midwest Veterinary Supply* case was approved by the Court in 1973.

Plaintiffs counsel, in their fee petitions and in their Plan of Distribution, have traced the history of the settlement negotiations from the original offer of $200,000 in 1969 to the ultimate payment of $38,150,000. The history of these settlement negotiations covers five years. From $200,000, the offers were increased numerous times as a result of hard negotiations, culminating in the approved amount of $38,150,000. The settlement, although fair and adequate, was only obtained through vigorous and difficult work by the members of the Farm Committee's negotiation committee.

In its Memorandum approving the proposed settlement the Court recited the difficulties and pitfalls with which plaintiffs had to contend before they would be able to recover damages. These included the acquittal of defendants Pfizer, Cyanamid and Bristol in the criminal case. There were also great differences between defendants marketing policies for products for human and non-human use. A further consideration was defendants' policies in the marketing of tetracycline for feed supplement purposes. The Court at that time noted that even if the plaintiffs were able to prove liability, they had substantial problems in proving damages.

Upon approval of the settlement and appointment of an escrow agent by the Court, the majority of the settlement fund was deposited with the Wachovia National Bank and Trust Company of North Carolina and began earning interest at the effective rate of 9.2%. As a

result of this deposit, the *Doughboy-Hoffert* "Gross Settlement Fund" should be in excess of $45,000,000.00 depending on date of distribution.

### SETTLEMENT ADMINISTRATION:

Upon approval of the settlement by the Court, the *Doughboy* Committee of Counsel began work on administration of the settlement. The administration committee was divided into several subcommittees. A claim form was approved by this Court, and mailed to *Doughboy* class members, including farm retailers. An explanation of the suit and the types of products which were included, along with detailed instructions for filling out the claim form, were sent with each mailing.

A Procedure Manual was prepared and adopted by the *Doughboy* Committee of Counsel. This manual outlined each procedure for receiving, processing, reviewing and making recommendation on claims filed. It established subcommittees to handle the work load. Jack Chestnut, Esq., was the principal author of the Procedure Manual and was Chairman of the Administration Committee which directed and coordinated this phase of the litigation.

Where claim forms were returned they were reviewed by the *Doughboy* Committee of Counsel, to identify defective claims. These defects included such items as not being signed, not being properly notarized, etc. After this, the claim forms were broken down into three categories by dollar amount of claimed purchases of broad spectrum antibiotics. The first was a small claims category for claimed purchases of less than $50,000. These small claims were handled by the Small Claims Committee chaired by Kenton Granger, Esq. The second group was the medium claims category for claimed purchases of $50,000 through $499,000. The Medium Claims Committee was chaired by Douglas Rigler, Esq. The third group was the large claims category, for claimed purchases of $500,000 and over. These were assigned to the Large Claims Committee chaired by Robert Howison, Esq.

The reports of the three committees, describing the ways in which the claims were handled, is on file with the Court. Briefly, the procedure was:

A) Small Claims—

Those claims for purchases of under $50,000 were reviewed by the Small Claims Committee, for defects in form and/or in completeness. If a defect was found, the claimant was called and instructed how to properly fill out his claim form. Discussions were had via phone and letter with numerous claimants in this category.

B) Medium Claims—

This Committee adopted the same standards as the Small Claims Committee for correcting technical defects. It contacted each claimant by letter or telephone, to advise him of procedures necessary to support his claim and earn committee recommendation of approval. Court approved letters were also sent to all claimants from whom more information was required in order to substantiate alleged purchases. After proofs of purchase were forwarded, the Medium Claims Committee worked with the various claimants in an attempt to determine, in a fair and proper manner, the acceptable purchases.

If in fact either the Medium or Small Claims Committee could not come to an agreement with the claimant, the claims were turned over to the Litigation Committee, for hearings pursuant to notice in front of Special Master Robert Bowen, Esq. All such notices and hearings were first approved by the Court, upon petition of the *Doughboy* Committee.

C) Large Claims—

The Large Claims Committee was responsible for 183 claims with purchases of $500,000 or more. A check list and verification form was prepared for audit of each claim by the Committee. Total claimed purchases for this

group was $434,831,898.14. In order to give these claimants the time and help they deserved, the Large Claims Committee conducted individual audits. If purchases were estimated, the estimate formula and the data base behind the formula were reviewed by the Committee's economist. Invoices were checked. In every instance but two, the Large Claims Committee was successful in being able to recommend approval of the claim or to reach an agreement with the claimant to amend his claim to an acceptable level. In the two instances in which agreement could not be reached, the matters were set for hearing before Special Master Bowen.

In every instance where a recommendation of disallowance was made by the Farm Committee, an opportunity for hearing before a Special Master was given pursuant to notice and order of this Court. The Special Master made several recommendations for allowance, disallowance, or reduction. Few of the claimants elected to appear at the hearings, but those that did were given a full opportunity to present their case to the Special Master.

The 5,778 claims were processed in a very expedient manner. In the conduct of their audits and investigations, the Committee of Counsel reduced the total claimed purchases from $572,698,042 to $444,519,598.79, thus returning many additional dollars to the remaining qualified claimants. All claimants, whether their claim was recommended for allowance or disallowance, were treated with courtesy, dignity and given every opportunity to appeal first to the committee, then to a Special Master, and finally to this Court at the final hearing. The Court takes notice that with 5,778 claims, not one claimant appeared to object to his allocation.

The Court would be remiss in failing to note the excellent, professional manner in which the entire administration of the settlement was carried out. Evidence of this excellence was never more apparent than at the final hearing, where all claimants were invited to attend and object to the amount of their claim, or to requested attorneys' fees. At the hearing on April 10, 1975, not one claimant appeared to protest the amount of approved purchases for claims. Several claimants were in the courtroom, as observers, and some spoke in support of the settlement administration and plan of distribution. A more detailed explanation of the administration of claims is attached as an appendix to the Proposed Plan of Distribution filed by the *Doughboy* Committee of Counsel.

HEARING:

By Administrative Order No. 75–95, dated March 15, 1975, this Court directed that notice be sent to all claimants in the *Doughboy* class, informing them that a hearing would be conducted on April 10, 1975, on allowance of claims, allocation and distribution of funds, and attorneys' fees and expenses. The notice set forth the proposed plan of distribution, and the recommended allocation of funds between the *Doughboy* and *Hoffert* classes. The notice also told each claimant that many attorneys had petitioned for fees from the settlement fund and that the fees awarded could conceivably run as high as $13,500,000. A list of each law firm that had filed a petition in the case and the amount requested and/or number of hours worked, were included with the notice. Further, each claimant was given notice of the amount of his claimed purchases which the committee would be recommending to the Court.

As stated above, no claimant appeared to object either to the recommended amount or his claimed purchases, or to the allocation of funds between *Doughboy* and *Hoffert.* Indeed, claimants spoke in favor of the settlement and of the proposed allocation.

One claimant did appear to state that attorneys fees should not exceed 25 percent of the entire settlement. While objecting to any award of fees over 25 percent, this claimant wholly endorsed the allocation of funds between *Doughboy* and *Hoffert,* and the overall plan of distribution.

## ALLOCATION OF FUNDS BETWEEN *DOUGHBOY* AND *HOFFERT:*

At the hearing, the Doughboy Committee of Counsel recommended that the *Doughboy-Hoffert* "Net Settlement Fund" be allocated on a basis of 40 parts for *Doughboy* and 6 parts for *Hoffert.* Affidavits of the two *Doughboy* economists substantiating such a division were filed on behalf of the Committee. No objections were made to this division by any member of the *Doughboy* class.

A week later, at the hearing on the *Hoffert* plan of distribution, the same recommendation was made. No members of the *Hoffert* class objected. Again, affidavits by economists for the Committee of Counsel for the *Hoffert* class were submitted, substantiating such a division.

On April 22, 1975, this Court entered Administrative Order No. 75–100, directing that the *Doughboy-Hoffert* "Net Settlement Fund" be divided with forty parts to the *Doughboy* class and six parts to the *Hoffert* class. The escrow agent was instructed to divide the "Net Settlement Fund" accordingly and to thenceforth keep separate books of account for each class. The interest earned upon the fund was apportioned in the same manner. Thus, out of the *Doughboy-Hoffert* "Net Settlement Fund" has been created the *Doughboy* Settlement Fund and the *Hoffert* Settlement Fund. It is estimated that the *Doughboy* Settlement Fund will be approximately $39,000,000.00 at time of distribution.

## PLAN OF DISTRIBUTION:

The plan of distribution recommended by the *Doughboy* Committee of Counsel is simple and straightforward.

It is set forth in the Plan of Distribution as follows:

| DOUGHBOY SETTLEMENT FUND | |
|---|---|
| Gross Doughboy Fund | |
| | Minus final expenses |
| Net Doughboy Fund to be prorated over total Class by amount of purchases. | |
| Group A | Minus payment of prorated share only to claimants having fee contracts with counsel for the Class which have not been waived. |
| Group B | Net-Net Doughboy Fund to be prorated to remaining Class Members by amount of purchases. |

■ The Court is of the opinion that those claimants in Group A, who are subject to a legal contract with private attorneys, should not be assessed twice. If they are forced to share in the overall award of attorneys fees from the entire class, and then made to honor their individual fee contracts, they will, in effect, be punished because their lawyers took an active role in the case. Rule 23 does not contemplate such treatment. See *Lindy Brothers Builders, Inc. of Philadelphia, et al. v. American Radiator and Standard Corp., et al.,* 487 F.2d 161 (3rd Cir. 1973).

The Gross *Doughboy* Fund will be reduced by final court approved expenses, leaving the Net Doughboy Fund remaining. Group A claimants (those with fee contracts with counsel for the class which have not been waived) will be paid from the Net Doughboy Fund. Their share will be determined by the ratio which their individual purchases bear to the total of approved purchases by the entire class.

Group B claimants (all others) will be paid from the Net-Net *Doughboy* Fund.

This fund is determined by subtracting from the Net *Doughboy* Fund payments made to Group A claimants and Court awarded counsel fees and expenses to counsel for the class. Each Group B claimants share will be determined by the ratio which their individual purchases bear to the total of approved purchases by Group B claimants.

The proposed plan of distribution and allocation was detailed in the notice; in addition, as stated above, each claimant was told the amount of his purchases which the committee would recommend be allowed. No claimant entered an objection.

■ The Court finds that the Plan of Distribution and allocation is supported by law, is reasonable and is sound. A computer list of each claimant, and the amount of his recommended purchases is on file with the Court. The Court adopts and approves the Plan of Distribution recommended by the Committee.

## ATTORNEYS FEES:

As stated above, some sixteen different applications and petitions for attorneys' fees have been submitted to the Court. Petitions were submitted pursuant to Administrative Order No. 75–79. That order set out basic guidelines for the submission of fees, and further required that petitions include the names of all lawyers who were to share in the fees awarded by the Court.

Administrative Order No. 75–93 dated March 15, 1975, further required all lawyers with retained clients in this case, to submit a list of their retained clients to the Court. These lists have been submitted and are on file with the Court.

At the April 10, 1975 hearing, each lawyer was given an opportunity to speak in regard to his fee application. The Court asked questions and took evidence as necessary, from certain lawyers. The Court also directed other attorneys to submit further evidence to the Court after the hearing. In every case, the petition of the attorneys included or has been supplemented by, affidavits by the attorneys verifying the number of hours worked. This is also true in respect to out-of-pocket expenses.

As noted above, the amount of attorneys fees requested, a list of each attorney requesting fees, and the number of hours and/or amount of fees requested, was contained in the notice sent to each member of the class. Every claimant was invited to object or comment in any fashion to the Court. Two claimants availed themselves of this opportunity. One supported payment of attorneys fees and congratulated the Farm Committee upon its superb job. He requested that the Court not award attorneys fees above 25 percent of the total settlement fund. The other claimant indicated that a fee award totaling one-third of the settlement would be eminently fair.

Each attorney's petition will be handled separately below. Before so doing, however, the Court feels it appropriate to discuss the standards which it will apply.

## STANDARDS FOR THE ALLOWANCE OF ATTORNEYS FEES:

■ Although the Clayton Act, Section 4, provides for the recovery of treble damages and attorneys fees and costs when judgment is reached, there is no statute providing for the award of attorneys fees in a settlement.

■■ Rule 23, itself, is silent concerning the award of attorneys fees and expenses. These awards are granted under the general equitable powers of the Court. If counsel for a particular class had pursued litigation to a successful end, to the benefit of the class, then each member of the class should, in turn, be called upon to adequately reward the attorney.

"Where the efforts of the claimant and his attorneys have produced a fund to be divided among all members of a particular class, it has been recognized first, that the claimant as a representative of the class is authorized to contract for all and to incur proper

expenses of litigation, and secondly, that the property produced by the efforts of such plaintiff and his attorney should bear the burden of the expense of attorneys so that each member of the class who benefits will contribute their due proportion." (Citations omitted). *Lindy Brothers Builders, Inc. v. American Radiator and Standard Sanitary Corporation,* 341 F.Supp. 1077–1082 (E.D. Penn., 1972), 487 F.2d 161 (3rd Cir. 1973).

While recognizing such equitable fund reasoning, the Court must also be cognizant of its duty (and the duty of class counsel) to protect and guard the absent members of the class. *Alpine Pharmacy, Inc. v. Chas. Pfizer & Company, Inc.,* 481 F.2d 1045 (2nd Cir. 1973); *State of Illinois v. Harper & Roe Publishers, Inc.,* D.C.Ill., 55 F.R.D. 221 (1972); *Norman v. McKee,* 290 F.Supp. 29 (1969).

This Court recognizes that efforts of class counsel are, in many aspects, *pro bono publico,* as noted by the manual for complex litigation:

"1. In seeking and accepting employment as counsel for a judicially determined class an element of public services is involved.

2. The representation of the class by counsel is not a result of private enterprise but results from provision of an opportunity to represent the class by judicial determination, and

3. The policy of the law in class actions . . . . . is to provide a motive to counsel to represent consumers and enforce laws." Section 1.47, page 50.

The Court must balance and weigh all of the equities involved in deciding what sum will adequately and fairly compensate the counsel for the class, who have done an excellent job, as opposed to what amount will not work a burden or hardship upon the class.

Through the years, various criteria have been used by different courts to determine appropriate reward. Although these criteria may at times be conflicting, all standards seem to agree that each case must turn upon its own facts and that it is up to the court to balance the various interests involved. All decisions lead to the inevitable determination that the fee should be "reasonable."

As Judge Will reflected in *Anna Liebman, et al. v. J. W. Peterson Coal & Oil Company, et al.,* 63 F.R.D. 684 (N.D.Ill., 1974). "The criteria to be applied in determining what represents reasonable fees in class actions are still in the process of evolution and clarification."

Prior to this decade, fees were generally awarded upon a percentage basis. These percentage awards were based upon the amount of recovery. Although this is still one factor, more recent decisions have considered multiple factors in determining the amount of the fee. See e. g. *Arenson v. Board of Trade,* 58 F.R.D. 540 (S.D.N.Y., 1973); *Pacific Coast Agricultural Export Association v. Sunkist Growers,* (N.D.Cal., 1973); *Fedder v. Harrington,* 58 F.R.D. 171 (S.D. N.Y., 1972).

The Court has reviewed Circuit Court and District Court decisions, in an effort to determine the best and fairest standards for the award of attorneys fees. *Colton v. Hilton Hotels Corp.,* 59 F.R.D. 324 (N.D.Ill., 1973); *Perkins v. Standard Oil Company,* 399 U.S. 222, 90 S.Ct. 1989, 26 L.Ed.2d 534, 1970; *City of Detroit, et al. v. Grinnell Corp., et al.,* 495 F.2d 488 (2nd Cir. 1974); *Brandenburger v. Thompson,* 494 F.2d 885 (9th Cir. 1974); *Lindy Brothers et al.,* supra; *In re Gypsum Cases,* 386 F.Supp. 959 (N.D.Cal., 1974); *Illinois v. Harper & Row Publishers,* supra; *Liebman v. J. W. Peterson Coal & Oil Company,* 63 F.R.D. 684 (N.D. Ill., 1974).

In addition, the Court has paid particular attention to a recent decision by the Court of Appeals for the 8th Circuit. *Grunin v. International House of Pancakes,* 513 F.2d 114 (8th Cir. 1975).

In that case, the Court of Appeals cited with favor *City of Detroit, et al. v. Grinnell Corp.,* supra. A primary concern, in both *City of Detroit,* and *International Pancake House,* is the number of hours devoted by the attorneys to the litigation. Other standards which must be applied, include the contingent nature of the plaintiff's action, and the results obtained and quality of the services rendered.

■ In awarding attorneys fees, this Court will consider the following:

1. Time and labor.

2. The contingent nature of the plaintiff's action.

3. The amount recovered and the beneficial results to the class.

4. The financial risk involved.

5. The standing at the bar of both plaintiffs' and defendants' attorneys.

6. The degree to which plaintiffs' counsel had the benefit of a prior criminal judgment or decree.

7. The scope and activity of the conspiracy under attack.

A) TIME AND LABOR INVOLVED: Pursuant to orders of this Court, most of the attorneys submitted their hours broken down into categories. These categories were:

a) General research, preparation of and response to pleadings, motions, briefs and memos.

b) Discovery work on depositions, interrogatories and document and transcript examination.

c) Court appearances and preparation, committee of counsel meetings, work with defense counsel and class members.

d) Damages, work on development of economic theories, data base, and supporting materials.

e) Settlement negotiations, preparation for settlement negotiations, and obtaining approval thereof.

f) Settlement administration.

g) Other.

In addition, the lawyers itemized the time worked by the different types of attorney in the firm, including senior attorney, intermediate attorney, associate attorney, and para-legal law clerk. Different types of work are deserving of different hourly rates. E. g. *City of Detroit, et al.,* supra; *In re Gypsum Cases,* supra; *International Pancake House,* supra. Where possible, the Court has considered the hours, the types of attorneys involved in the work, and the nature of the work done.

B) CONTINGENT NATURE OF THE PLAINTIFF'S ACTION: This category, and the next category, the amount recovered and beneficial results to the class, are considered together. It is important to note at the beginning, that many of these attorneys have worked upon this particular litigation for seven years. The class recovery is great. No fees were advanced to plaintiffs' attorneys over that period. The plaintiffs were challenging a world-wide marketing conspiracy, allegedly conducted by several major multinational corporations. The quality of the defense lawyers, which will be discussed *infra,* was exceedingly high. The history of settlement negotiations and the various offers made, in and of itself, shows the success and benefit to the class. If nothing had been recovered, the many thousands of hours put in by these law firms would not be compensated. The law firms, acting as "private attorneys general", have sought enforcement and retribution for their clients, and have succeeded.

Although hours must be the primary starting point for any award of attorneys' fees, the Court does and must take the contingent nature of this litigation, together with the substantial benefit reaped by the class, into consideration when awarding fees. As a consequence, the Court will attempt to apply a contingency factor or a risk factor to several of the hourly rates listed below.

C) THE AMOUNT RECOVERED AND THE BENEFICIAL RESULTS TO THE CLASS. See above.

## D) FINANCIAL RISK INVOLVED:

The financial risk involved in these cases by plaintiffs' lawyers was tremendous. Not only did they bear their share of the PNSC costs, but law firms who had attorneys devoting a substantial portion of their time to this case were not able to engage those lawyers in other matters. Having several attorneys in one firm working on one piece of litigation for a seven year period, and thus earning little or no income during that period, is a great financial burden for that firm. In addition, in these cases, the *Doughboy* plaintiffs were required to pay their portion of masters' fees, deposition and transcript fees, travel expenses, etc. Although the second category properly belongs, and will be considered, in the out-of-pocket expense portion, it is important to note that had the plaintiffs lost, or not been able to achieve this settlement, some of these amounts would be gone forever. The financial risk in this litigation was substantial, and the Court will take it into account.

## E) THE BENEFIT OF PRIOR GOVERNMENTAL DECREES:

As stated in this Court's opinion approving the settlement of these actions, none of the "Farm Cases" had the benefit of any prior governmental decrees. Thus, as opposed to the human cases, the attorneys in the "Farm Cases" were alone without the support of the United States Government. This is not to disparage the government's role in these cases. The United States has always been a member of the Plaintiffs' National Steering Committee, and is currently in trial before this Court on related cases. The previous criminal case and the FTC case, however, basically dealt with the production, sale, and use of tetracycline in human dosage form. Although these cases were started after the criminal indictment in New York, the farmers had always maintained that they were not relying on prior government actions for a showing of prima facie liability.

## F) STANDING AT THE BAR OF BOTH PLAINTIFFS' AND DEFENDANTS' ATTORNEYS:

The various attorneys' standing at the bar will be discussed below. Suffice it to say that in general, their standing is excellent. Most of the attorneys are well-known and experienced antitrust lawyers.

An important consideration, however, which will be discussed here is the standing of the defendants' attorneys at the bar. Defendants in these cases are five multi-national corporations. They have been involved in antibiotic litigation in one form or another for the past twenty years. They have spent millions of dollars defending these actions. The Court does not know the exact number of attorneys involved on defendant's side, but has personally met and seen in the courtroom, at least 150 over the five years of this litigation.[2] For every attorney in the courtroom, at least five more must be involved behind the scenes. The law firms employed by the defendants are all excellent. The fact that the defendants have spent such a great many dollars paying such established and skillful defense lawyers to defend this action, must have some significance upon the amount of fees awarded to the Plaintiffs' attorneys. The Plaintiffs' attorneys in this class action have been up against the best, and should be compensated accordingly.

## G) MAGNITUDE AND COMPLEXITY OF THE ISSUES INVOLVED:

The question of magnitude and complexity of the issues involved were addressed directly in this Court's Memoranda Approving Settlement. Suffice it to say that this was a very complex case involving numerous legal issues, some of which were of first impression. All familiar with the case know of its magnitude.

---

**2.** The Court does know, through submissions of the defendants, that defendants have used over 520 foreign law firms and 180 U.S. law firms with respect to broad spectrum antibiotics.

The Court itself has labored over this litigation for some five years. It has read thousands of documents, briefs, etc. which have been filed to date. The docket in this litigation is currently over 200 pages of single-spaced entry. A separate room is needed for the clerk's files alone. A special deputy clerk had to be hired simply to handle the filings. A typical pretrial conference would bring 35 to 75 lawyers before this Court. Defendants have paid out approximately $178,000,000 in settlements and still have some 20 cases in litigation. The cases now in trial before this Court started in November, 1974. The end is not in sight. Five Special Masters have worked at various times and on various problems in this case. Large national classes, including the *Doughboy* class, have been formed, managed, settled and the monies are in the process of being distributed. This case has been a lifetime work for many of the defense lawyers, and at least eight years of labor for some of the Plaintiffs' lawyers. The issues involved in the litigation range from the standing of a foreign government to sue under the Clayton Act, to fraud upon the Patent Office. It is the Court's opinion that these cases may be the most complex litigation ever handled by the federal judiciary. To enter it as a representative of the plaintiffs, to risk financial ruin, and to survive, and to come up years later with a substantial settlement is a task well deserving of reward.

H) SCOPE OF ACTIVITY AND CONSPIRACY UNDER ATTACK: The scope of activity and conspiracy under attack has been discussed in the many memoranda of this Court. The defendants in this case are, as stated before, international corporations, and the conspiracy alleged was of an international nature. The length of the present trial is an indication of the scope of the activity and alleged conspiracy under attack.

In assigning a value to the contribution of each lawyer, the Court has first set an hourly rate and then applied a multiple or risk factor to such a rate. The multiple, or risk factor takes all of the above standards into consideration and differs with the type of work performed and the lawyer performing it. See *In re Gypsum,* supra.

In addition to the above factors, the Court must, of course, also take into consideration the amount of fees to be received from retainer clients, and the amount of fees recovered in related cases in the antibiotic antitrust litigation.

Listed below is a discussion of each fee application, the amount awarded, and the basis upon which the Court has made such an award.

1. Cochrane and Bresnahan; John Cochrane:

John Cochrane has filed a petition requesting that the Court allow him a reasonable fee. His fee application states that he worked a total of 15,191.25 hours on the antibiotics antitrust litigation. These hours not only included work on the *Doughboy* class action, but also included work spent on the *Hoffert* class action and related cases before Judge Wyatt. The great extent of Mr. Cochrane's time was, however, spent on *Doughboy,* and as chairman of the Plaintiffs National Steering Committee. There is no magic formula for the Court to set a reasonable fee for Mr. Cochrane. His contributions to the *Doughboy* class action and to this litigation in general have been overwhelming. In Court appearances alone, Mr. Cochrane has logged more time than any single lawyer in this entire litigation. Mr. Cochrane spoke on behalf of the farmers and often on behalf of the PNSC at every pretrial, hearing, discovery matter or hearings before the Masters. He was the acknowledged leader of the troops, chief spokesman, and master-mind behind this litigation. Without him, and of course, without the assistance of the other lawyers whom the Court will discuss below, this litigation would not have proceeded in

such an orderly, manageable and speedy (for its size) fashion. In considering a normal hourly rate for one whose standing is as high as Mr. Cochrane's, and several other of the attorneys in this action, the Court will use the figure of $100 per hour. This will not be so when setting the rates for junior or intermediate attorneys, or for para-legals. The Court is certain that this is a reasonable, albeit not large, hourly rate for a lawyer with the reputation and stature of Mr. Cochrane. Assigning an hourly rate of $100 per hour, indicates a fee of $1,519,125. To that amount, the Court must add the risk factor, and the sum of all of the other considerations listed above. In taking into account a risk factor multiple, the Court has assigned the highest possible risk factor to Mr. Cochrane. Eight years of his legal life were devoted to these cases. Failure on the part of Mr. Cochrane would have meant financial disaster, not only for he and his law firm, but for the other lawyers in the *Doughboy* lawsuit. He carried a tremendous burden on his shoulders, and did it well. The Court is thus assigning a risk factor, or multiple of three, to Mr. Cochrane's hourly rate. Although normally, such a high risk factor would not be assigned to one whose hours were not broken down, the Court must repeat that Mr. Cochrane is an exception to most attorneys, and indeed, was the guiding light behind these cases. The Court is also personally aware of his continuous contributions to these cases. Multiplying the hourly rate times three, brings us to a total fee computation of $4,557,375.00. The Court must then take into consideration the fees awarded and to be possibly awarded in other class actions, and Mr. Cochrane's retainer clients. As a result, the Court is deducting $1,500,000 from this fee computation. This results in a net fee of $3,057,375. The Court believes this fee is eminently reasonable due to the great amount of work done by John Cochrane. This opinion is not only held by the Court but by all of the lawyers of the Farm Committee, who spoke on the record in support of the Cochrane & Bresnahan's fee petition, praised Mr. Cochrane for his legal ability, and further requested that he be considered favorably by the Court in regard to his firm's application.

2. Chestnut, Jones, Brooks, Kennedy & Burkard and Chestnut, Brooks & Burkard, P. A.; Jack L. Chestnut & Floyd E. Boline.

The law firm of Chestnut, Brooks & Burkard (Chestnut firm) has submitted a petition to the Court, breaking down its hours into the categories requested. The law firm has expended a total of 19,643.4 hours on this case. The hours broken down by category and type of attorney are set forth below. In assigning an hourly rate to the senior lawyers of the Chestnut firm, the Court again used the $100 figure. Jack Chestnut and Floyd Boline are exceptional lawyers, well recognized by the local and national plaintiffs' antitrust bar as leaders in their field. It is important to remember that Mr. Chestnut was responsible for drawing up and supervising the total administration plan of the settlement. At the hearing, the other lawyers on the committee again spoke with great favor of Mr. Chestnut and his ability, and requested that the Court look favorably upon any applications for fees by the Chestnut firm. Several statements were made that without the assistance of both Cochrane and Chestnut, the lawsuits would not have been settled, and indeed would be several light-years away from settlement and distribution. Mr. Chestnut's time at court appearances is great, and increased his stature before this Court manyfold. The Court, in assigning an hourly rate for the junior attorneys in the Chestnut firm, used the rate of $40 an hour, and for para-legal time, a rate of $20 an hour.

In assigning hourly rates, the Court also took into consideration the high hourly rate which should be placed upon settlement negotiations. As a result, the Court awarded an hourly fee of $200 an hour for this particular work. This in

effect was the most important of all categories in obtaining the result. It also should be noted that on the Chestnut application, an hourly rate of $200 per hour was assigned to settlement administration for senior attorneys. This is principally the time of Mr. Chestnut who above all else, organized, masterminded and was responsible for the orderly and complete fashion in which the administration of the settlement was carried out. The highest possible praise must go to Mr. Chestnut for this particular work.

As is the case with all of the firms, work assigned to the "other" category was given an hourly rate of $50.

In deciding multiple factors or risk factors, the Court used the following multiples:

Category A. General research, preparation of and response to pleadings, motions, briefs and memos, 2.5. This high risk factor was assigned to this category due to the fact that the Chestnut firm and the Cochrane firm jointly brought the first farm class action lawsuits in this litigation. They have also been in the forefront all the way through the litigation. As is shown by their total hours, this was entire firm effort, which pre-empted much of the other work that the firm could do; it does deserve a high risk factor.

Category B. Discovery work on depositions, interrogatories and document and transcript examination; risk factor 2.

Category C. Court appearances and preparation, committee of counsel meetings, work with defense counsel, and class members; risk factor 2.5. The Court again feels that a very high risk factor should be put on this particular classification for the Chestnut firm. Their leadership was excellent, and they were always ready to represent the Farm plaintiffs in a superior fashion. The Court is personally aware of their contributions.

Category D. Damages, work on development of theories, based on supporting evidence, risk factor 2.

Category E. Settlement negotiations, preparation for settlement negotiations, negotiations, obtaining approval thereof, risk factor 2.

Category F. Settlement administration, risk factor 1.

Category G. Other, risk factor 1.

After assigning the hourly rates and multiple factors described above, the result is:

| Categories | Senior | Junior | Para-Legal | Hourly Rate | Contingency Multiple | Total |
|---|---|---|---|---|---|---|
| A. | 3,153 | 390.8 | 106.8 | 333,068.00 | 2.5 | $   832,670.00 |
| B. | 4,155 | 275.1 | 156.9 | 429,642.00 | 2 | $   859,284.00 |
| C. | 4,827.6 | 477.1 | 234.0 | 506,524.00 | 2.5 | $1,266,310.00 |
| D. | 1,236.6 | 107.5 | 205.9 | 131,678.00 | 2 | $   236,355.00 |
| E. | 384.4 | 6.5 | | 77,140.00 | 2 | $   154,280.00 |
| F. | 2,297 | 1,194.4 | 78.4 | 508,762.00 | 1 | $   508,762.00 |
| G. | 209 | 32.4 | 115 | 14,046.00 | 1 | $     14,046.00 |
| | | | | | 0 | |
| | | | TOTAL | | | $3,871,707.00 |

Again, the Court must take into consideration the amount to be received in other actions, and the amount to be received from retainer clients. In taking these factors into consideration, the Court deducts a total of $1,185,000 from the fee computation of Chestnut, Brooks & Burkard. This leaves a total fee award from *Doughboy* of $2,686,707.00.

The Court believes that this is an eminently reasonable fee for the amount of work done by this particular law firm and its very fine lawyers.

3. Crane, Martin, Claussen, Hamilton & Barry; Donald Barry.

Crane, Martin, Claussen, Hamilton & Barry (the Barry firm) has submitted a fee application requesting the Court to award it a reasonable attorneys' fee for the work of Donald Barry Esq. The hours are not completely broken down, but the 11,700 total hours includes 500 hours of para-legal time, and 1,700 hours of settlement administration time. The Barry firm is also heavily involved with the consumer actions, representing the consumers of the State of Kansas. Mr. Barry's total contribution to this case has been immense. The number of hours stated, which are of great magnitude, indicate the amount of time and effort spent by Mr. Barry on these cases. Mr. Barry was one of the leaders in the discovery efforts, spending many months in New York taking depositions. We have seen Mr. Barry at all relevant court appearances and hearings before Masters. The Court is familiar with Mr. Barry's reputation and standing with the local bar and the national bar as a plaintiffs class action lawyer. Mr. Barry was a fine and valuable asset to the Farm Committee of Counsel. The Court again sets his reasonable hourly attorney rate at $100 an hour. His para-legal rate will be $20 an hour. Setting his total hourly rate, less para-legal time, at $100 an hour, brings us to a total figure of $1,120,000 for regular billable hours. An additional $10,000 is added for para-legal time, bringing his total hourly time to $1,130,000. Before applying any type of contingency rate, the Court must take into consideration the 1,700 hours spent by Mr. Barry on settlement administration. Although the Court is aware that Mr. Barry was on the Large Claims Committee, and spent a great deal of time on the road, physically auditing the large claims, the Court is unwilling to apply a risk or contingency factor to time spent on settlement administration in which there was no risk. Thus before applying any type of contingency factor, $170,000 must be subtracted from the total hourly rate. This leaves a total fee computation to which a risk factor is to be applied of $960,000. In assessing a risk factor for Mr. Barry, the Court considers 1.5 to be adequate. Had Mr. Barry's hours been better broken down, perhaps a higher risk factor might have been considered for certain categories of hours. In any event, applying a 1.5 risk factor equals $1,440,000. To this must be added back the $170,000 for work on administration, for a total of $1,610,000.

The Court must also take into consideration the fact that the Barry firm has a large retainer client, and will also be receiving a fee out of the consumer cases. The Court therefore deducts $1,060,000 from the Barry firm's fee computation. This amounts to a fee award of $550,000 from the *Doughboy* class action. The Court finds that this fee is eminently reasonable.

4. Foley, Lardner, Hollabaugh & Jacobs; Douglas Rigler.

Douglas Rigler has spent a considerable amount of time and effort on these cases. Foley, Lardner, Hollabaugh & Jacobs (the Rigler firm) has submitted a fee application requesting a fee of $1,643,400. In addition, the Rigler firm has requested fees for possible future administration. The application is broken down by hours as the Court requested into the various categories. Members of this firm are known to this Court, and have done an outstanding job in this action. Mr. Rigler was the third person on the Settlement Negotiation Committee, and was extremely valuable in bringing this action to a conclusion. Thus, in assigning an hourly rate to the Rigler firm, the Court again uses $100 per hour, except in the settlement negotiations, where it uses an hourly rate of $200. As with the Chestnut firm and all other firms, the "other" category was assigned a rate of $50 an hour, and associates

were assigned a rate of $40 an hour. This application indicates that the amount of hours submitted in the *Doughboy* class excludes any hours spent upon the other case which this firm has before this Court. In assessing a risk or contingency factor, the Court has assigned a multiple of 2 to all of the categories except settlement administration and "other". Although this risk factor is not as high as that of the Cochrane or Chestnut firms, in some particular areas, it shows an overall rating of excellence from this Court. In assigning a lower contingency factor than the Cochrane and Chestnut firms, the Court among other things, takes into consideration the lesser number of hours expended by this firm. Although 5,832 hours is an extraordinary amount of time to expend on any particular case, it does not bear the same risk factor as that borne by the Cochrane firm and the Chestnut firm. The hourly breakdowns, the assigned hourly rate, and the contingency factors are listed below:

| Categories | Partners | Associates | Hourly Rate | Contingency Factor | Total |
|---|---|---|---|---|---|
| A. | 1,395 | 38 | $141,020.00 | 2 | $ 282,040.00 |
| B. | 2,054 | 133 | $210,720.00 | 2 | $ 421,440.00 |
| C. | 1,082 | –0– | $108,200.00 | 2 | $ 216,400.00 |
| D. | 254 | –0– | $ 25,400.00 | 2 | $ 50,800.00 |
| E. | 330 | –0– | $ 66,000.00 | 2 | $ 132,000.00 |
| F. | 513 | 18 | $ 52,020.00 | 1 | $ 52,020.00 |
| G. | 15 | –0– | $ 750.00 | 1 | $ 750.00 |
| | | | TOTAL | | $1,155,450.00 |

Since the Rigler firm's hours for the *Doughboy* case are segregated, the Court will not take into consideration any fees which it might receive from other cases in this litigation. The Rigler firm has few retainer clients. In making its fee application, the firm waived any fee that it might receive from such clients. Accordingly, the firm's clients will be treated in category B of the plan of distribution. No amount will be deducted from the firm's fee. The Court's total award is $1,155,450 to the Rigler firm. The Court finds that this fee is eminently reasonable.

5.   Anderson, Granger, Nagels & Lastelic; Kenton Granger.

Anderson, Granger, Nagels & Lastelic (the Granger firm) has submitted a fee application requesting a fee of $800,000. The total number of hours submitted by the firm equals 4,367.2. Of these hours, all are claimed to be spent by Kenton Granger. A small number of these hours were spent in related cases. The Court however, feels that these hours benefited the *Doughboy* class and is including them in this award.

Once again, the Court can only speak with highest esteem as regards the professional ability, character, standing and help of Mr. Granger. Mr. Granger has had considerable experience in the plaintiffs antitrust field, including representing the State of Kansas in several actions. His contribution to these cases was substantial. The Court has seen Mr. Granger at many pretrial hearings. The Court is thus assigning an hourly rate of $100 an hour for Mr. Granger's time except for the "other" category to which the Court assigns $50 an hour. For settlement negotiations, the Court assigns

$200 an hour. The risk factor applied to Mr. Granger is the same as that applied to the Rigler firm. It is high and signifies Mr. Granger's efforts and total contribution. The hours, hourly rates, risk factors, etc., are as below:

| Categories | Hours | Hourly Rate | Total | Contingency Factor | Total |
|---|---|---|---|---|---|
| A. | 1,267 | $100.00 | $126,700.00 | 2 | $253,400.00 |
| B. | 1,427 | $100.00 | $142,700.00 | 2 | $285,400.00 |
| C. | 916 | $100.00 | $ 91,600.00 | 2 | $183,200.00 |
| D. | 2 | $100.00 | $ 200.00 | 2 | $ 400.00 |
| E. | 41 | $200.00 | $ 8,200.00 | 2 | $ 16,400.00 |
| F. | 644 | $100.00 | $ 64,400.00 | 1 | $ 64,400.00 |
| G. | 71 | $ 50.00 | $ 3,550.00 | 1 | $ 3,550.00 |
| | | | | TOTAL | $806,750.00 |

The Court again takes into consideration that the Granger firm has large retainer clients who will add a considerable amount to his fee. As a result, the Court is deducting $100,000 from the Granger firm fee computation, giving it a total fee award from the *Doughboy* action of $706,750. The Court finds that this fee is eminently reasonable.

6. Hamrick & Hamrick; Nat Hamrick.

The Hamrick firm has submitted a fee application requesting a total of $864,-000.00. The total number of hours submitted by the firm are 3,303. These hours are not broken out into any type of category. The Court is familiar with Mr. Hamrick and some of his work. It does recognize his standing at the bar, and his significant contribution. The Court is aware that Mr. Hamrick was active on the Farm Committee, and did participate and prepare for depositions in general discovery work. Once again, in assigning an hourly rate, the Court uses the factor of $100 per hour. This totals $330,300. To this, the Court applies a risk factor of 1.5. Higher risk factors can only be applied where the application indicates the work performed or the Court has personal knowledge of that work. After applying a risk factor of 1.5, the Court arrives at a figure of $480,000. The Court has considered the retainer client of this firm and finds no adjustment necessary. The Court awards $480,000 to the firm of Hamrick & Hamrick. The Court finds that this fee is eminently reasonable.

7. Joyner & Howison; Robert Howison and Odes Stroupe.

The firm of Joyner & Howison, (the Howison firm) who were co-counsel with Hamrick & Hamrick, representing Edward Brothers Milling, has applied for a fee of $631,125. The fee application submitted shows a total of 3,003 hours on the case. As with the case of Hamrick & Hamrick, the Court is not aware of how these hours are broken down. The Court is familiar with both Mr. Howison and Mr. Stroupe and their efforts in this law suit. The Court is aware that both Mr. Howison and Mr. Stroupe contributed a great amount of time and legal effort to the culmination of these cases. Mr. Howison was chairman of the Large Claims Committee. The Court is also aware that Mr. Stroupe spent considerable time in Europe and New York City, over many months, preparing for and taking depositions. As a result, the

Court again awards an hourly rate of $100. This totals $300,300. The Court again applies a contingency factor of 1.5 to these hours. Applying the contingency factor of 1.5, gives a total fee computation of $495,450. As was the case with Hamrick & Hamrick, the Court has considered the retainer client of this firm and finds no adjustment necessary. The total fee award of Joyner & Howison is $495,450.

8. Jack McCann, Esquire.

Jack McCann has filed a joint application with the law firm of Graham & Graham. The amount requested by Jack McCann is $325,000. Mr. McCann's fee application shows a total of 1,430 hours.

In assigning an hourly rate, the Court takes into consideration the fact that Mr. McCann is an experienced and well-respected member of the Ohio bar. Mr. McCann did contribute significantly to the conclusion of this case, and will be assigned an hourly rate of $100 per hour. The Court also assigns a contingency factor of 2 to categories A and B, general research and discovery work, but assigns only a 1.5 contingency factor to category C, court appearances. A quick perusal of the category C time for the Chestnut firm, the Rigler firm and the Granger firm, or others, will show a significant difference in contribution for this category. The total number of hours, and multiples, are:

| Categories | Hours | Hourly Rate | Total | Contingency Factor | Total |
|---|---|---|---|---|---|
| A. | 171 | $100.00 | $17,100.00 | 2 | $ 34,200.00 |
| B. | 415 | $100.00 | $41,500.00 | 2 | $ 83,000.00 |
| C. | 493 | $100.00 | $49,300.00 | 1.5 | $ 73,950.00 |
| D. | 0 | | | | |
| E. | 0 | | | | |
| F. | 351 | $100.00 | $35,100.00 | 1 | $ 35,100.00 |
| G. | 0 | | | | |
| | | | | TOTAL | $226,250.00 |

From the total fee computation of $226,250, the Court subtracts the amount of $20,000 for retainer clients. This results in a total fee award of $206,250 for Mr. McCann. The Court finds that this fee is eminently reasonable.

9. Graham & Graham; James Graham.

Graham & Graham, (the Graham firm), has filed a joint application with Jack McCann, requesting a total award of $325,000. Total hours submitted by Mr. Graham are 990. Although the Court has seen Mr. Graham few times over the years of this litigation, it is aware that Mr. Graham is a well respected member of the bar who concentrates

much of his activity on trial work and in antitrust work. Accordingly, the Court will assign the same hourly rate and contingency factor as Mr. McCann. The number of hours and contingency factors are listed below:

| Categories | Hours | Hourly Rate | Total | Contingency Factor | Total Total |
|---|---|---|---|---|---|
| A. | 258 | $100.00 | $25,800.00 | 2 | $ 51,600.00 |
| B. | 189 | $100.00 | $18,900.00 | 2 | $ 37,800.00 |
| C. | 233 | $100.00 | $23,300.00 | 1.5 | $ 34,950.00 |
| D. | 0 | | | | |
| E. | 0 | | | | |
| F. | 310 | $100.00 | $31,000.00 | 1 | $ 31,000.00 |
| | | | | TOTAL | $155,350.00 |

From this amount, the Court also takes into consideration retainer clients, and subtracts $20,000 from the total fee computation. Thus, the total fee award for the Graham firm is $135,350. The Court finds this fee is eminently reasonable.

10. H. Darrell Dickens and John W. Elrod & Brown, Compton & Prewett, by William I. Prewett.

These three attorneys have filed joint and separate applications, basically covering the same work. A further problem developed in that a dispute between old partners, caused William I. Prewett, John W. Elrod and Robert C. Compton to bring an action against H. Darrell Dickens in the State of Arkansas for a declaratory judgment as to who was entitled to share in any fee award that was made. Mr. Dickens then brought a motion before this Court for this Court to take jurisdiction of the dispute, and resolve the matter.

The Court deplores such unprofessional conduct on the part of these attorneys, but did speak to representatives of both sides in an effort to resolve the situation. The Court is aware that these attorneys have agreed on a division of any fee to be awarded.

Although a total of some 1400–1500 hours are claimed by these individuals, the Court finds that there has been little benefit to the class and the Court cannot in good conscience make an award of over $50,000. The Court is also aware that these attorneys will be compensated from their retainer clients and has taken this into consideration. These attorneys are awarded a fee of $50,000. The Court finds that this fee is eminently reasonable.

11. Ferguson & Burdell; Thomas J. Greenan.

Ferguson & Burdell, (the Greenan firm), has requested that the Court award it a fee of $200,000. The fee application states a total of 13,076 hours of work in all of the antibiotics litigation. The Greenan firm represents the State of Washington in the human consumption cases, and has devoted a great deal of time and energy to these actions. Mr. Greenan is a well respected member of the antitrust bar. The number of cases which he has worked on are long and well known in the antitrust field. The Court, applying the minimum hourly rate of $100 an hour for Mr. Greenan, arrives at an hourly rate of $1,307,600. Using the smallest multiple of 1.5 results in a total fee computation of $1,961,400. From this amount must be deducted the fees received and to be received in other cases. The Court thus feels that a re-

quest of $200,000 from the *Doughboy* action is fair and reasonable. It is impossible to state with any degree of clarity the amount of contribution which Mr. Greenan and his firm have contributed to all of the antibiotics cases. Suffice it to say that he was one of the primary movers in this litigation, in both the human consumption and in the *Doughboy* actions. The fee award of Mr. Greenan will accordingly be $200,000. The Court finds this fee to be eminently reasonable.

12. Shea, Gallop, Climenko & Kramer; Jesse Climenko and Beddow, Embry & Beddow; and T. Erick Embry.

These two firms have filed an application requesting fees of $65,000. The lawyers, who represent many retainer clients, claim a total of 700 hours. Both law firms have experienced lawyers and senior attorneys who worked upon the case. The Court thus applied the $100 an hour rate. This would total $70,000. Applying a risk factor of 1.5, the Court comes up with a total fee computation of $105,000.. From this amount, the Court takes into consideration and subtracts the fees to be earned from retainer clients. Thus the Court subtracts $50,-000 and awards the firm of Shea, Gallop, Climenko & Kramer and Beddow, Embry & Beddow, the total sum of $55,000 as fees in this matter. The Court finds that this fee is eminently reasonable.

13. Doherty, Rumble & Butler; Eugene Warlich.

Doherty, Rumble & Butler, (the Warlich firm) has requested a total award of $45,405. This represents a total of 462 hours. 448.75 hours were expended by Mr. Warlich, 13.25 hours of para-legal time were expended. All of Mr. Warlich's time was on settlement administration. Mr. Warlich's standing at the bar is above reproach, as is that of his firm. The Court accordingly assigns a $100 an hour rate to Mr. Warlich's hours. The Court also assigns an hourly rate of $20 an hour for para-legal time. The Court

is aware that this firm has expended additional time in this litigation on behalf of its retainer clients and will be compensated by these clients. Since the entire time in this application was on settlement administration, the Court will not assign a contingency factor. Accordingly, the total award for the Warlich firm is $45,140. The Court finds that this fee is eminently reasonable.

14. State of Oregon, Oregon Attorney General, Attorney James W. Durham, Assistant Attorney General.

The State of Oregon has filed an application in the *Doughboy* action, and was on the committee of counsel in the *Doughboy* action. The main involvement of the State of Oregon and its para-legals has, however, been in the human consumption cases, and it is from these that the Court will expect that Oregon is to receive most of its attorneys fees. The Oregon application states a total of 6,432.5 hours total time upon these actions; this time is divided into 3,143.5 hours attorneys time and 3,389 hours para-legal time. Applying a multiple of $100 per hour results in a total for attorneys time of $314,350. Applying a $20 an hour rate for para-legal time, results in a total of $67,780. This combined total is $382,130. Applying a contingency factor of 1.5 the Court arrives at a fee computation of $573,195. From this total amount, the Court subtracts $503,000, leaving a total fee award in *Doughboy* of $70,195 to the State of Oregon. The Court finds that this fee is eminently reasonable.

15. Law Firm of Joseph Alioto, Attorney Guido Saveri.

Mr. Saveri has submitted an application requesting a reasonable attorneys fee from the Court. Mr. Saveri's application states a total of 3,869 hours. Mr. Saveri has been active in the human consumption cases, including representing two states. Mr. Saveri is also counsel for the class representative in the Union

Health & Welfare cases which are on trial before this Court at the present time. Mr. Saveri's reputation and standing at the bar are well known, and the Court again applies the hourly rate of $100 per hour. Applying the rate of $100 per hour results in a total of $386,-900. Applying a contingency factor of 1.5, leads to a total fee computation of $580,350. Taking into consideration all of the other awards, which Mr. Saveri may receive in the state human consumption cases plus the state institutional cases, the Court subtracts the amount of $520,000 from Mr. Saveri's fee computation. That leaves a total fee award of $60,350. The Court finds that this fee is eminently reasonable.

### 16. Estate of J. Lewis Parks.

There is one other fee application which the Court wishes to discuss. The widow of J. Lewis Parks, Beverly Parks, filed a fee application in the *Doughboy* class on behalf of his estate. J. Lewis Parks was an attorney who was early in the cases, helped set up the Plaintiffs National Steering Committee and the Farm Committee. During the course of these cases, Mr. Parks died. His widow is requesting a fee of $200,000 for work done to benefit the class. The Court is familiar with the early work done on this litigation by J. Lewis Parks and feels that his contribution was substantial. The hours expended by Mr. Parks were 700 in number. Applying an hourly rate of $100 an hour, results in the figure of $70,000. Applying a risk factor of 2, the Court arrives at a total fee to be awarded of $140,000. The Court finds that this fee is eminently reasonable.

Mr. John Anderson, of the Granger firm represented the widow of Mr. Parks in her fee application. Mr. Anderson has filed a petition requesting that the Court award his fee from the fee of the estate of J. Lewis Parks. Accordingly, $5,000. is awarded to Mr. Anderson, such amount to be deducted from the award to the estate of J. Lewis Parks. The Court finds that this fee is eminently reasonable.

The Court wishes to state that in arriving at the above fee awards, it has spent many hours studying the fee applications, the appropriate law and the files and records and briefs, herein. The Court has attempted to treat everybody fairly, and according to the same standards. The Court finds that the total fee awards are reasonable for the size of the recovery, and the amount of hours expended by the attorneys. The attorneys in this action are as fine a group of lawyers as this Court has encountered. They have indeed earned their fees. This return to the class will be substantial.

All of the attorneys have also requested reimbursement of out-of-pocket expenses. Certain of these expenses arose in achieving the settlement, and other expenses have occurred in settlement administration. The requests for reimbursement of expenses were all submitted with affidavits and other supporting data. The Court has reviewed all of these, and finds that they are not improper and they will be allowed. Part of these expenses, for certain of the attorneys, were previously advanced pursuant to Administrative Order No. 74–51. Notice of all of the requested expenses were included in a notice to the class members, and no objections were received at the hearing. Listed below are the names of each law firm, the amount of expenses requested, the amount of expenses paid pursuant to Administrative Order No. 74–51, and the amount of expenses approved for payment at this time.

| Law Firm | Expense Requested | Amount of Prior Payment | Approved For Payment |
|---|---|---|---|
| Cochrane & Bresnahan | $138,366.59 | $123,254.79 | $15,111.80 |
| Chestnut, Brooks & Burkard | $202,813.65 | $168,751.94 | $34,061.71 |
| Crane, Martin, Claussen, Hamilton & Barry | $ 29,657.88 | $ 21,693.14 | $ 7,964.74 |
| Foley, Lardner, Hollabaugh & Jacobs | $ 39,841.88 | $ 36,109.88 | $ 3,732.00 |
| Anderson, Granger Nagels & Lastelic | $ 43,677.55 | $ 36,939.50 | $ 6,738.05 |
| Hamrick & Hamrick | $ 26,144.04 | $ 22,265.30 | $ 3,878.74 |
| Joyner & Howison | $ 27,647.34 | $ 17,615.55 | $10,031.79 |
| Jack McCann & Graham & Graham | $ 34,249.85 | $ 24,224.80 | $10,025.05 |
| H. Darrell Dickens | $ 5,807.30 | $ –0– | $ 5,807.30 |
| Brown, Compton & Prewett | $ 6,691.77 | $ –0– | $ 6,691.77 |
| Ferguson & Burdell | $ 19,562.49 | $ 17,360.65 | $ 2,201.84 |
| Shea, Gallop, Climenko & Kramer | $ 15,519.33 | $ 15,519.33 | |
| Doherty, Rumble & Butler | $ 7,600.63 | $ 5,645.02 | $ 1,955.61 |
| State of Oregon | $ 9,764.33 | $ –0– | $ 2,000.00 |

Where expenses have occurred primarily due to non litigation, the Court has pro rated or eliminated those charges from the *Doughboy* class.

CONCLUSIONS:

The Plan of Distribution proposed by the *Doughboy* Committee is approved as filed. The recommendation of the *Doughboy* Committee of Counsel for allowance and disallowance of claims as filed is approved. The Doughboy Committee is hereby discharged of its duties. The Court appoints the law firms of Cochrane & Bresnahan and Chestnut, Brooks & Burkard, P.A., for any winding up of administration that may be necessary. Upon final resolution of all matters and receipt of the invested funds by the escrow agent, the Court will appoint a paying agent and order that checks be written to pay claims, attorney's fees and expenses. This is expected to be in the near future. The attached orders awarding attorneys fees to the individual attorneys and law firms and approving the Plan of Distribution are final. No funds, however, can be distributed until the appropriate appeal time has run. If there should be an appeal, the Court intends to set aside enough funds to cover

amounts claimed in such an appeal and to distribute the balance of the funds.

The Court congratulates the lawyers involved for an excellent and outstanding job, both in the obtaining of this settlement and in its administration. Long ago, arguments were made to this Court by defendants in this case, stating that national class actions were unmanageable. The Court has dealt with this question throughout its opinions and in particular in its opinion dealing with the approval of this settlement. The handling of this litigation and the professional and thorough way in which the settlement administration was carried out again indicates to this Court that large national class actions are indeed manageable.