Anna Marie ORTEGA, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

MERIT INSURANCE COMPANY and Aronson Furniture Company, Defendants.

Robert HERNANDEZ, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

UNITED FIRE INSURANCE COMPANY and Aronson Furniture Company, Defendants.

Nos. 76 C 2314, 76 C 2638.

United States District Court, N. D. Illinois, E. D.

May 31, 1977.

Robert E. Masur, Garfield Austin Legal Services, Chicago, Ill., for Ortega and Hernandez.

Gerald M. Rotheiser, Stern & Rotheiser, Chicago, Ill., for Merit Ins.

Fohrman, Lurie, Holstein & Sklar, Chicago, Ill., for Aronson Furniture Co.

Theodore P. Fields, Fields, Smoller & Fields, Chicago, Ill., for United Fire Ins. Co.

## MEMORANDUM OPINION

WILL, District Judge.

These are two related actions alleging a discriminatory pricing scheme for the sale of credit property insurance. In No. 76 C 2314, plaintiff, a "brown-skinned resident alien of Hispanic (Mexican) origin", sues for declaratory and injunctive relief and monetary damages pursuant to 42 U.S.C. § 1981. In No. 76 C 2638, plaintiff, a Spanish-surnamed citizen of the United States, sues for similar relief under 42 U.S.C. §§ 1981 and 1982. Motions to dismiss have been filed in each case. For the reasons herein stated, we deny in part and grant in part the motions to dismiss.

### I.

Credit property insurance is sold, generally, in connection with retail installment credit sales of property. The insurance protects against damage or destruction to the property during the life of the contract. Two types of credit property insurance are relevant to our discussion of the instant cases: (1) single interest insurance, which protects only the creditor's interest, defined as the unpaid balance at the time of the occurrence of the insured risk; (2) dual interest insurance, which purportedly protects both the creditor's and the debtor's interest, so that if the depreciated value of the property destroyed is worth more than the creditor's interest, the debtor receives the difference. Conversely, if the property destroyed is not worth more than the creditor's interest, the benefits paid under the dual interest policy will be no greater than those paid under the single interest policy.

Plaintiff in each case alleges that United sold single interest insurance in stores with predominantly Caucasian customers at a rate of $1.50 per $100 of insurance per year, but only dual interest insurance, at a rate of $4.00 per $100 of insurance per year, in stores with predominantly non-Caucasian customers. Merit is alleged to have entered the market in 1973, selling dual interest insurance at the $4.00 rate to selected stores, the great majority of whose customers were black or Hispanic.

In April 1974, the Illinois Department of Insurance ordered United to lower its dual interest rates and make both single and dual interest policies available at all retail establishments marketing its insurance. United subsequently lowered the dual inter-

est rate to $3.00 per $100 of insurance per year. Merit continued the $4.00 rate until June 1976.

## II. MOTIONS TO DISMISS

### A. *Ortega*

Defendant Merit moves to dismiss on the ground that there are no allegations that Merit sold property insurance to different people based on race, and that none of the persons who contracted with Merit were in any way forced to contract or were unable to purchase insurance from any other person or entity. Merit further alleges that plaintiff Ortega lacks standing to sue as the insurance agreement was signed by plaintiff's husband rather than plaintiff.

▮ Prior to dealing with these defenses, however, a more basic question of jurisdiction and standing, not addressed by the parties, exists. 42 U.S.C. § 1981 provides as follows:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Plaintiff asserts that she is a "brown skinned resident alien of Hispanic (Mexican) origin." Merit is alleged to discriminate against blacks and Hispanics with the knowledge that many Hispanics are brown-skinned or aliens. There has been some discussion as to whether § 1981 actions are restricted to claims of *racial* discrimination or may be brought on grounds of alienage, religion, national origin, or sex discrimination. It has become established that the distinction between § 1981, which applies to "all persons," and 42 U.S.C. § 1982, which protects "all citizens," indicates that § 1981 may be used to vindicate rights infringed by discrimination based on alienage. *See Takahashi v. Fish and Game Commission,*

334 U.S. 410, 419–20, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948). A § 1981 action may, therefore, be brought against Merit for allegedly discriminating against blacks and aliens. A greater division of opinion exists, however, as to the scope of § 1981 over claims of national origin discrimination. In a well reasoned and scholarly opinion, Judge Fogel in *Jones v. United Gas Improvement Corp.,* 68 F.R.D. 1, 15 (E.D.Pa. 1975), denied a cause of action alleging discrimination against Spanish-surnamed individuals, holding

For these reasons, we conclude that the provisions of 42 U.S.C. § 1981 *are limited in their application to discrimination, the effect of which is to deny to any person within the jurisdiction of the United States any of the rights enumerated in that section, to the extent that such rights are enjoyed by white citizens of this nation.* Discrimination on other grounds, such as religion, sex, or national origin, to which white citizens may be subject, as well as white non-citizens, non-white citizens, or non-white non-citizens, is not proscribed by the statute. (Emphasis in original.)

*See also Gradillas v. Hughes Aircraft Co.,* 407 F.Supp. 865 (D.Ariz. 1975); *Schetter v. Heim,* 300 F.Supp. 1070 (E.D.Wis. 1969).

Several cases, however, have applied § 1981 to United States citizens of Puerto Rican descent, *Maldonado v. Broadcast Plaza, Inc.,* 10 FEP Cases 839 (D.Conn.1974), or to other Spanish surnamed or Hispanic persons. *Miranda v. Clothing Workers Local 208,* 10 FEP Cases 557 (D.N.J. 1971). An example of the rationale of such decisions is found in *Budinsky v. Corning Glass Works,* 425 F.Supp. 786, 788 (W.D.Pa. 1977), which dismissed a § 1981 action charging discrimination in employment against people of Slavic origin:

The terms "race" and "racial discrimination" may be of such doubtful sociological validity as to be scientifically meaningless, but these terms nonetheless are subject to a commonly-accepted albeit sometimes vague, understanding. Those courts which have extended the coverage

of § 1981 have done so on a realistic basis, within the framework of this common meaning and understanding. On this admittedly unscientific basis, whites are plainly a "race" susceptible to "racial discrimination;" Hispanic persons and Indians, like blacks, have been traditional victims of group discrimination, and however inaccurately or stupidly, are frequently and even commonly subject to a "racial" identification as "non-whites." There is accordingly both a practical need and a logical reason to extend § 1981's proscription against exclusively "racial" employment discrimination to those groups of potential discriminatees.

The same cannot be said with regard to persons of Slavic or Italian or Jewish origin. These persons are not commonly identified as "races" nor so frequently subject to that "racial" discrimination which is the specific and exclusive target of § 1981. Members of these groups, like plaintiff Budinsky, do not properly fall within the coverage of the statute.

\*     \*     \*     \*     \*     \*

Section 1981 covers employment based upon race or upon what (perhaps from the point of view of the discriminator) might pragmatically be deemed as "race." It does not cover plaintiff. He alleges discrimination against him by the defendant employer not because he is white per se but because he is Slavic. . . .

*See also Sokolski v. Corning Glass Works,* 14 FEP 936 (W.D.Pa. 1977).

■ We recognize the logical problems in the "pragmatic" approach, whereby an ethnic minority, such as Italians and Jews at the turn of the century or Hispanics today, may "drift" within and later without Section 1981 protection, depending on the circumstances of the times, and the shifts in recognition of ethnic and racial equality by the majority. But we agree with the above-cited cases that there is both "a practical need and a logical reason" today to include people of Hispanic origin as a group entitled to the protection of § 1981 against claims of discrimination such as alleged herein. Hopefully, the day is not too far

distant when § 1981 will become obsolete and discrimination on racial and ethnic grounds will be a matter of history. So long as such discrimination continues, however, the reason and purpose of the section as well as its language are applicable to ensure that such groups enjoy the same rights under the law as the white majority. Accordingly, we find that the subject matter of the case is properly before us.

■ We next turn to defendant's claim that plaintiff Ortega does not have standing to bring this action as she did not sign the insurance agreement complained of and, therefore, has suffered no injury. Plaintiff has enclosed a copy of the retail installment sales contract and insurance agreement as Exhibit "A" of her complaint. It indicates that the buyer was Fernando Ortega and his name appears as the signatory on the insurance agreement. Plaintiff's name appears as co-signer at the bottom of the installment contract. At the time the contract was entered into, Section 19 of the Illinois Retail Installment Sales Act, *Ill.Rev. Stat.* 1973, ch. 121½, § 519, provided:

No provision in a retail installment contract obligating a person other than the retail buyer or spouse of the buyer to assume liability for payment of the deferred payment price of a co-signer for the buyer is valid unless the co-signer, in addition to signing the retail installment contract, signs a separate instrument in the following form:

EXPLANATION OF CO–SIGNER OBLIGATION

The undersigned as a co-signer has agreed to pay the deferred payment price of a retail installment contract between (name of buyer) and (name of seller) made on (date of transaction) for (description of goods or services) at a total deferred payment price of ($.....)

AS A CO–SIGNER THE UNDERSIGNED WILL BE LIABLE AND FULLY RESPONSIBLE FOR PAYMENT OF THE ABOVE PRICE EVEN THOUGH THE UNDERSIGNED IS NOT ENTITLED TO

ANY OF THE GOODS OR SERVICES FURNISHED THEREUNDER.

THE UNDERSIGNED MAY BE SUED IN COURT FOR THE PAYMENT OF THE AMOUNT DUE UNDER THE AFORESAID RETAIL INSTALLMENT CONTRACT EVEN THOUGH THE BUYER THEREUNDER MAY BE WORKING OR HAVE FUNDS TO PAY THE AMOUNT DUE UNDER THE AFORESAID RETAIL INSTALLMENT CONTRACT.

. . .

The deferred payment price for which co-signer Ortega became obligated includes the charges for insurance. Although plaintiff has not provided us with a copy of the actual co-signer statement, her signature at the bottom of the installment contract, according to the terms of that agreement, constitutes an acknowledgment of receipt of completed copies of the contract and co-signer statement. We assume that she did sign the separate co-signer statement and can supply or obtain a copy thereof. Unless it subsequently appears to the contrary, therefore, we find that plaintiff is obligated for the payment of the insurance premiums and has standing to challenge them.

Turning to the substantive aspects of the case, plaintiff rests her § 1981 claim on two theories: (1) that Merit intentionally substituted itself for United Insurance in the latter's discriminatory marketing scheme, thereby continuing the practice under which non-whites were charged more than whites for comparable insurance; and (2) that Merit's decision to establish an unreasonable insurance rate based upon impermissible racial factors was unlawful. Defendants have moved to dismiss, stating that plaintiff, at most, has alleged that Merit sold property insurance in minority neighborhoods at high prices.

Plaintiff attempts to buttress her first theory of liability by means of the rationale of *Clark v. Universal Builders*, 501 F.2d 324 (7th Cir. 1974). In that case, the Seventh Circuit adopted an exploitation theory of liability in § 1982 cases which we had sustained in *Contract Buyers League v. F & F Investment*, 300 F.Supp. 210 (N.D.Ill. 1969). Under this theory, the fact that Merit sold only dual interest insurance (rather than single interest insurance to whites and dual interest insurance to non-whites) would not be fatal to a claim of discrimination if it could be shown that "defendants exploited a situation created by socioeconomic forces tainted by racial discrimination." 501 F.2d at 330. The Court rejected defendants' contention that

> other sellers and not they were the active agents of discrimination. That is, blacks were excluded from the white market by other sellers who refused to sell to plaintiffs and that accordingly plaintiffs' action lies solely against those other owners and real estate operators and not the defendants. But, we repeat, defendants cannot escape the reach of section 1982 by proclaiming that they merely took advantage of a discriminatory situation created by others. We find repugnant to the clear language and spirit of the Civil Rights Act the claim that he who exploits and preys on the discriminatory hardship of a black man occupies a more protected status than he who created the hardship in the first instance. 501 F.2d at 331.

Although the *Clark* and *Contract Buyers* cases involved § 1982 claims, the exploitation theory of liability is equally applicable to § 1981. Both §§ 1981 and 1982 are derived from section 1 of the Civil Rights Act of 1866 and the standards determined from the latter have been frequently applied to the former. *See Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *Tillman v. Wheaton-Haven Recreation Ass'n*, 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973); *see also Clark v. Universal Builders*, 409 F.Supp. 1274, 1278 (N.D.Ill. 1976).

■ We recognize, as defendants have urged, that the credit consumer business is distinguishable from the residential housing market. It is also true that the *Clark* opinion relied upon extensive socioeconomic testimony to support its findings. It is not our function at this time, however, to determine

the merits of the instant controversy. Plaintiff has alleged that a de facto system of discriminatory credit insurance pricing exists, and that defendant is exploiting this system. This is sufficient to withstand the motion to dismiss.

■ With respect to plaintiff's second ground, that defendants established a higher premium rate based on impermissible racial factors, this contention, if proved, would clearly constitute a violation of § 1981. If, as defendant contends, the higher premium merely reflects a higher risk and was not charged uniformly to blacks or persons with Hispanic surnames regardless of their financial or economic status, plaintiff will fail in her proof. The complaint, however, alleges a cause of action on this ground as well. We, therefore, deny Merit's motion to dismiss the action.[1]

### B. *Hernandez*

Plaintiff Hernandez, a Spanish-surnamed citizen of the United States, brings an action under §§ 1981 and 1982 against United Fire Insurance and Aronson Furniture Company,[2] alleging that United sold dual interest insurance only through stores with predominantly black or Spanish-surnamed customers, and single interest insurance only through retail merchants whose customers are predominantly Caucasian. Aronson is charged with knowingly discriminating by making available to its customers only dual interest insurance. Plaintiff also brings claims against defendants under the Illinois Retail Installment Sales Act, *Ill.Rev. Stat.* ch. 121½, §§ 501 *et seq.*, and the Illinois Consumer Fraud and Deceptive Business Practices Act, *Ill.Rev.Stat.* ch. 121½, §§ 261 *et seq.*, pursuant to the doc-trine of pendent jurisdiction. Both defendants have moved to dismiss.

### 1. *United*[3]

■ United bases its motion to dismiss the federal claims on the ground that plaintiff has not exhausted the administrative remedies available through the Illinois Department of Insurance, relying upon *United A.A., and A.I.W. of America v. State Farm M.A.I. Co.*, 350 F.Supp. 522 (N.D.Ill. 1972). In that case, a union and a group of motorists sued various insurance companies on the ground that the companies, in establishing zones for new insurance rates, segregated the bulk of the black population of Chicago into one zone and imposed substantially higher rates there. Judge Bauer found that, where plaintiffs could challenge the rates through the procedures authorized by the Illinois Insurance Code, plaintiffs must first exhaust the administrative remedy before bringing a suit under §§ 1981–1983.

■ We do not find *United A.A.* applicable to the instant situation. We note first that Judge Bauer relied in part upon *Metcalf v. Swank*, 444 F.2d 1353 (7th Cir. 1971), which was vacated and remanded by the Supreme Court, 406 U.S. 914, 92 S.Ct. 1778, 32 L.Ed.2d 1113 (1972). Following remand, the Seventh Circuit held that exhaustion was not required. Moreover, the Seventh Circuit later stated, with respect to a § 1981 case, that "an exhaustion of remedies requirement does not appear to apply to claims for relief brought under any of the civil rights acts." *Waters v. Wisconsin Steel Works of International Harvester Co.*, 502 F.2d 1309, 1316 (7th Cir. 1974). Judge Bauer himself noted in a later case that "the plaintiff does not have to exhaust his

---

1. Defendants have further argued that there are alternative sources of insurance and that plaintiff need not have purchased insurance at all in order to secure the property purchased on credit. The de facto significance of these allegations, when placed in the actual socioeconomic context which would describe factors such as the nature of the sales and the comprehension of the terms by the consumer, is best left until expert testimony has been produced in discovery or at trial.

2. Aronson was originally also named as a defendant in the Ortega suit. The parties have informed us, however, that a settlement has been reached, and the claims against Aronson by Ortega will therefore not be discussed.

3. We reiterate our prior discussion of the applicability of § 1981 to discrimination based upon national origin. Additionally, as a citizen of the United States, plaintiff Hernandez may also invoke the protection of 42 U.S.C. § 1982.

administrative remedies before he can bring an action under 42 U.S.C. § 1983." *Willis v. Chicago Extruded Metals Co.*, 358 F.Supp. 848, 852 (N.D.Ill. 1973). Finally, even if we assumed that administrative procedures needed to be exhausted, we take judicial notice from the allegations in *Ortega* that the Department of Insurance, which does not have authority to award damages, has already ordered United to make available both single and dual interest insurance policies in all stores and to lower its dual interest rates. We see little to be gained in a second administrative proceeding. United's motion to dismiss on grounds of exhaustion is therefore denied.

■ United next moves to dismiss the count alleging that it violated both the Illinois Retail Installment Sales Act, *Ill.Rev. Stat.* ch. 121½ §§ 501 *et seq.*, and the Illinois Consumer Fraud & Deceptive Business Practices Act, *Ill.Rev.Stat.* ch. 121½, §§ 261 *et seq.* United first argues that it is not a "retail seller," as defined in § 502.4 of the Retail Installment Sales Act, and that the sale of credit property insurance is not a retail installment sale. Section 502.4 defines a retail seller as

> a person regularly engaged in, and whose business consists to a substantial extent of , selling, and who in the ordinary course of business regularly sells or offers to sell goods or services to retail buyers.

"Goods" are defined in part as "all goods used or purchased primarily for personal family, or household purposes," § 502.1, and "services" as

> work, labor or services of any kind rendered or furnished or agreed to be rendered or furnished by a retail seller for a use other than in business . . . but does not include services for which tariffs, rates, premiums or charges are required by law to be determined or approved or to be filed with and subject to approval or disapproval by this State or the United States or by any department, division, agency, officer, or official of either this State or the United States;
> . . . § 502.2.

We believe that in certain situations, insurance may be considered a service, and that an insurance company may be considered a retail seller for purposes of the Act. In their efforts to distinguish the various types of insurance covered by the Act, however, both parties have neglected an examination of § 508, which plaintiff claims has been violated by United. Section 508 provides:

> A seller under a retail installment contract or retail charge agreement may require insurance against substantial risk of loss or of damage to the goods protecting the seller or holder, as well as the buyer, and include therefor in the contract an amount not exceeding the premiums chargeable for similar insurance in accordance with rate filings made with the Director of Insurance. A seller under a retail installment contract or retail charge agreement may not require other insurance; but if the buyer voluntarily contracts therefor, the seller may then include in the contract an amount for that other insurance not exceeding the premiums paid or payable by the seller or holder. In those transactions where the buyer elects to select the insurance company, broker or agent for the purpose of obtaining insurance required by the holder under this Section, the buyer must furnish the holder with satisfactory evidence of insurance on or before the date when the buyer takes possession of the goods.

We think it clear that § 508 is directed at retail sellers, such as the furniture company involved in the instant situation, which provide for insurance to be taken to protect their own merchandise. Otherwise, given the language of the Act, the seller [insurer] would be "requir[ing] insurance against substantial risk of loss of or damage to the [insurance] protecting the [insurer]," an obviously irrational result. We therefore grant United's motion to dismiss the claim based upon the Retail Installment Sales Act.

■ United also moves to dismiss the claim based on the Illinois Consumer Fraud Act on the ground that, at the time the contract was entered into, there was no private right of action. Plaintiff has countered by citing *Rice v. Snarlin, Inc.,*131 Ill. App.2d 434, 266 N.E.2d 183 (1970), which

found an implied right of action to exist, and defendants have not replied to this contention. We may therefore deny United's motion to dismiss this claim.

### 2. *Aronson*

██ Aronson moves to dismiss the §§ 1981 and 1982 claims on the grounds that its actions do not fall within any of the recognized theories of discrimination:

"(a) the 'traditional' theory, whereby a defendant directly treats two groups of people differently based on race; . . .

"(b) the 'wilful participant' theory, whereby a defendant knowingly goes along with or acts to aid or perpetuate a racially discriminatory scheme; . . .

"(c) the 'exploitation' theory, whereby a defendant exploits a person's position in society because of his race, although there is no evidence that the defendant directly treated the two groups differently."

Both sides have directed their discussion primarily to the "wilful participant" standard. We believe, however, that this theory has no application to the instant situation. The phrase "wilful participant" originated in *United States v. Price*, 383 U.S. 787, 794, 86 S.Ct. 1152, 1156, 16 L.Ed.2d 267 (1966), in which the Court, discussing the "under color" of state law requirement of 18 U.S.C. § 242 (the criminal counterpart to 42 U.S.C. § 1983), stated

Section 242 applies only where a person indicted has acted 'under color' of law. Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of the statute. To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents.

The concept of "wilful participant" has been used only in the state action context. *See, e.g., Potenza v. Schoessling*, 541 F.2d 670, 671–72 (7th Cir. 1976). It is not a type of discrimination, as are the traditional and exploitation theories of liability. As state action has no relevance to our discussion here, we will turn to Aronson's other grounds for dismissal.[4]

██ With respect to the "traditional theory," although it is accepted that Aronson has sold only dual interest insurance, plaintiff has alleged that Aronson had knowledge and was a part of United's discriminatory scheme and acted as United's agent in making the sales. We are reluctant to impose liability on this basis. Under this reasoning, for example, retailers which sold only single interest United insurance, and were therefore part of the overall scheme, would be liable even though their practices and rates would be entirely proper. In the absence of a conspiracy allegation, therefore, we do not think that Aronson can be liable under the "traditional" theory.

██ We do, however, find that plaintiff has stated sufficient grounds under the exploitation theory to sustain his claims against a motion to dismiss. With knowledge that dual interest insurance had no advantage to it over single interest, and with knowledge of the racial makeup of its customers and the practices of United, Aronson allegedly sold only the higher priced insurance with its goods. As we stated in *Contract Buyers, supra*, 300 F.Supp. at 216:

[D]efendants' position elaborated is that if property is sold to a negro above what can be demonstrated to be the usual market price, there can be no discrimination unless the same seller actually sells to whites at a lower price. It should be clear that in law this result would be obnoxious. In logic, it is ridiculous. It would mean that the 1866 Civil Rights Act, which was created to be an instrument for the abolition of discrimination, allows an injustice so long as it is visited exclusively on negroes.

In sum then, there is no reason to distinguish a refusal to sell on the ground of

---

**4.** The parties have also extensively discussed the ramifications of *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) in defining the standard for wilful participant. Although we need not reach this question in light of our discussion above, we note in passing that we find plaintiff's assertion that *Washington v. Davis* "does not hold that discriminatory intent must be proven . . . to sustain 42 U.S.C. §§ 1981 and 1982 claims; rather it supports the conclusion that intent need not be proven," somewhat remarkable.

race and a sale on discriminatory prices and terms.

We therefore deny Aronson's motion to dismiss.

An order will enter in 76 C 2314 denying Merit's motion to dismiss. An order will enter in 76 C 2638 granting United's motion to dismiss the claim founded upon the Illinois Retail Installment Sales Act, denying its motion to dismiss on the other grounds, and denying Aronson's motion to dismiss.