Robert HERNANDEZ and William Ashford, each on behalf of himself and all other persons similarly situated, Plaintiffs,

v.

UNITED FIRE INSURANCE COMPANY, Defendant.

No. 76 C 2638.

United States District Court, N. D. Illinois, E. D.

July 20, 1978.

Robert E. Masur, Daniel Rosenblum, James Latturner, Jerrold Oppenheim, Legal Assistance Foundation of Chicago, Chicago, Ill., for plaintiffs.

Theodore P. Fields, Fields, Smoller & Fields, Chicago, Ill., for defendant.

## ORDER

BUA, District Judge.

This is a class action alleging discriminatory and deceptive practices in the sale of credit property insurance. The second amended complaint consists of two counts, each naming as defendants United Fire Insurance Company (United) and Aronson Furniture Company (Aronson).

United is engaged in the business of credit property insurance. Its method of operation, at least in part, is to enter into agreements with retailers of various merchandise who in turn sell the insurance to individuals in connection with installment sales contracts.[1] Count I, brought under 42 U.S.C. §§ 1981 and 1982, charges that United,· in its arrangements with various retailers in Illinois, knowingly discriminated against Blacks and Hispanics.[2] Specifically, it is

---

1. Credit property insurance is generally sold in connection with retail installment credit sales of property. The insurance protects against damage or destruction to the property during the life of the contract. Two types of credit property insurance are relevant here. (1) single interest insurance, which protects only the creditor's interest, defined as the unpaid balance at the time of the occurrence of the insured risk; (2) dual interest insurance, which purportedly protects both the creditor's and the debtor's interest, so that if the depreciated value of the property destroyed is worth more than the creditor's interest, the debtor receives the difference. Conversely, if the property destroyed is not worth more than the creditor's interest, the benefits paid under the dual interest policy will be no greater than those paid under the single interest policy.

2. It should be noted that a recent decision in this district held that persons of Hispanic origin should be treated as a race for purposes of 42

alleged that during the period from April 1, 1971, to August 1, 1974, United sold "single interest"[3] credit property insurance at the rate of $1.50 per $100 of insured value per year through retailers having a large majority of Caucasian customers, and yet, without justification in terms of increased risks or significant additional benefits to purchasers, sold only "dual interest" insurance at a $4.00 per $100 rate through retailers having a large majority of Black or Hispanic customers. Defendant Aronson allegedly participated in this scheme as a retailer through which United sold only the more expensive dual-interest insurance. The named plaintiffs are Robert Hernandez (Hispanic) and William Ashford (Black). Hernandez and Ashford made credit purchases from Aronson on May 9, 1973, and February 2, 1974, respectively, under installment contracts which included a purchase of United dual-interest credit property insurance. They seek to represent the class of "all purchasers of United Fire Insurance Company dual-interest credit property insurance through Aronson Furniture Company at the rate of $4.00 per $100 of insured value per annum."

Count II is a pendant state claim based on the Illinois Consumer Fraud and Deceptive Business Practices Act. Ill.Rev.Stat. ch. 121½ § 261 et seq. It alleges that during the same April, 1971, to August, 1974, period defendants sold United credit property insurance to Aronson customers in amounts based on the total of payments due on installment contracts (a figure which included taxes, finance charges, and other items) rather than on the cash price of the merchandise, despite the fact that United's liability was in any case limited to the cash value of the property at the time of damage or loss. Plaintiffs contend that this constituted a deceptive business practice under

Ill.Rev.Stat. ch. 121½ § 262.[4] On this count, named plaintiff Hernandez seeks to represent the class of "all persons who purchased credit property insurance from United through Aronson from April 1, 1971, to August 1, 1974, pursuant to retail installment contracts terminating on or after July 19, 1973, in which the total of payments owing on the contract was greater than the cash price of the property insured."

Shortly after filing their second amended complaint, plaintiffs made an amended motion for certification of the proposed class on each count. These motions are now before the court for decision. Some months later, the named plaintiffs, through their attorneys, entered into a "stipulation" agreement with Aronson. This stipulation provided that both counts would be dismissed with prejudice as to the named plaintiffs against Aronson, and that, "to satisfy the claims of certain Aronson customers . . ." as embodied in Count II, Aronson would pay $7,500 to be collected, held, and distributed in a manner outlined in some detail. In an order dated March 2, 1978, the court, on plaintiffs' motion, adopted the terms of the stipulation. In the wake of these events United has moved to dismiss or for summary judgment on both counts. Briefly, its argument on Count I is that plaintiffs have effectively admitted its non-liability in dismissing Aronson. On Count II United argues that the stipulation amounted to a release, of which it, as an alleged joint-tortfeasor with Aronson, may avail itself. These motions as well are before the court.

## A. Count I.

### 1. The Class Certification Motion

In order to be certified under Rule 23, a class action must satisfy all the re-

---

U.S.C. § 1981. *Ortega v. Merit Insurance Co.*, 433 F.Supp. 135 (N.D.Ill.1977).

**3.** See note 1, *supra*.

**4.** Ill.Rev.Stat., ch. 121½ § 262 provides in part:
Unfair methods of competition and unfair acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of

any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

quirements of Rule 23(a) and qualify under at least one of the three subdivisions of Rule 23(b). The burden of proof as to the satisfaction of these requirements rests with the plaintiffs. *Valentino v. Howlett,* 528 F.2d 975 (7th Cir. 1976).

■ Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." It is undisputed here that a class exists and consists of at least 13,000 members. The Rule 23(a)(1) requirement of numerosity is therefore satisfied.

■ Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Clearly, each class member's claim shares the questions whether the defendants did sell different forms of insurance at unjustly disparate prices and whether, if they did, this conduct violated the rights of class members protected under 42 U.S.C. § 1981 and/or § 1982. Commonality as required by Rule 23(a)(2) is then present.

■ Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." It is doubtful that subdivision (a)(3) imposes any real limitation on class actions beyond those contained in subdivisions (a)(2) and (a)(4). 7 Wright and Miller § 1764; 3B Moore's Federal Practice § 23.06–2. In any case, the claims of Ashford and Hernandez cannot but be "typical" of the class claims for they are, except as to the amount of damages claimed, identical to those of other class members. Clearly, differences in the amount of damages sought do not destroy typicality. *Rodriguez v. Swank,* 318 F.Supp. 298, 294 (N.D.Ill.1970) *aff'd without opinion,* 403 U.S. 901, 91 S.Ct. 2202, 29 L.Ed.2d 677 (1971).

■ Rule 23(a)(4) requires a finding that "the representative parties will fairly and adequately protect the interests of the class." While a great variety of specific formulations have been offered, it is clear that adequate representation consists of two general elements: 1) it must appear that the representative parties, through their attorneys, will vigorously prosecute the class claims, and 2) there must be an absence of conflict or antagonism between the interests of the named plaintiffs (in the subject matter of the litigation) and those of other members of the proposed class. *See, e. g., Muth v. Dechert, Price and Rhoades,* 70 F.R.D. 602, 604–05 (E.D.Pa. 1976).

Regarding the first of these two elements, United argues that the named plaintiffs are inadequate class representatives because of their lack of personal interest in this case and because of their unfamiliarity with its alleged factual basis. In support of this United points out that depositions of Hernandez and Ashford revealed that neither came initially to the Legal Assistance Foundation [5] for purposes directly related to this action. Rather, each came for assistance relative to a suit brought against him by Aronson for alleged nonpayment of amounts required under his installment contract. Neither plaintiff had any personal knowledge of alleged discriminatory practices by the defendants. At one point, Ashford stated that he had been unaware that he was a party in this case until some months after he was in fact added as a named plaintiff. Neither, apparently, had read the original complaint or the amended version on file at the time his deposition was taken.

■ Generally speaking, in assessing the likelihood that the named plaintiffs will vigorously prosecute class claims, consideration tends to focus on the competence and experience of class counsel. Indeed, this aspect of adequate representation is very often couched entirely in terms of counsel's qualifications. *See, e. g., Susman v. Lincoln American Corp.,* 561 F.2d 86, 90 (7th Cir. 1977). This court finds it clear, however, that Rule 23(a)(4) does warrant some inquiry into the personal characteristics of the individual representatives as well. 7 Wright and Miller Federal Practice and Procedure § 1766; *see, e. g., In re Goldchip Funding Co.,* 61 F.R.D. 592, 594–95 (M.D. Pa.1974). It is often stated that the class

---

**5.** Plaintiffs are represented by counsel from Legal Assistance Foundation of Chicago.

representatives must themselves meet certain standards of "forthrightness" and "vigor". *E. g., Cobb v. Avon Products, Inc.,* 71 F.R.D. 652, 655 (W.D.Pa.1976); *Tomkin v. Kaysen,* 69 F.R.D. 541, 544 (S.D.N.Y.1974). In this vein, courts have quite properly refused to certify classes where the named plaintiff was guilty of prior fraudulent conduct or would be likely to present incredible testimony, *Amswiss International Corp. v. Heublein, Inc.,* 69 F.R.D. 663, 670 (N.D.Ga. 1975), had engaged in activities clearly indicating a tendency toward deceit and the disregard of important duties, *Cobb v. Avon Products, Inc., supra,* 71 F.R.D. at 655, had demonstrated an unwillingness to comply with the requirements of discovery, *Norman v. Arcs Equities Corp.,* 72 F.R.D. 502, 506 (S.D.N.Y.1976), appeared to be an unwilling plaintiff who had been essentially compelled to pursue the action, *Tomkin v. Kaysen, supra,* 69 F.R.D. at 543, or had been solicited by his attorneys, *Carlisle v. LTV Electrosystems, Inc.,* 54 F.R.D. 237, 240 (N.D.Tex.1972). Here, however, there is nothing to indicate that the named plaintiffs are dishonest or are not in fact sincere and willing in their participation. United makes no charge that the named plaintiffs were improperly solicited by their attorneys. Prior to being joined as a party each signed a short and plainly worded statement to the effect that he had been advised of the nature of the case and wished to proceed with it. Ashford's failure to recall his joining personally in the suit and the fact that neither plaintiff had read the complaint prior to his deposition do not, when viewed as the acts of laymen of very limited education, suggest dishonesty, insincerity, or unwillingness any more than naiveté toward legal procedures, a lack of coaching by their attorneys, and an understandable difficulty in relating to a complex lawsuit which would not come to trial for months or years, if ever. On the other hand, the plaintiffs have made themselves available to the extent thus far necessary, and have been cooperative and responsive to questioning. These facts are much more probative of their ability to properly represent the class.

United argues, nonetheless, that the named plaintiffs' lack of familiarity with the alleged facts of this case is such as to render them inadequate as class representatives. Initially, there is some basis for doubt whether such a lack of knowledge on the part of the named representative could ever, by itself, justify a denial of certification. *See, e. g., Ridgeway v. I. B. E. W. Local No. 134,* 74 F.R.D. 597, 605 (N.D.Ill. 1977); and *see In re Goldchip Funding Corp., supra,* 61 F.R.D. 595 (dicta regarding the case where a named representative shows a "keen interest" in the litigation). Assuming however, that at least in this case knowledge may in some manner be important, there would appear to be no deficiency in that possessed by the named plaintiffs. United seeks to rely principally on *In re Goldchip Funding, supra,* and *Seiden v. Nicholson,* 69 F.R.D. 681 (N.D.Ill.1976). In *Goldchip,* the court suggested two major reasons why class representatives should possess a certain level of knowledge and/or interest in the litigation: (1) in order to assist counsel as a source of factual information, and (2) in order to provide a check on counsel's discretion in controlling the case. 61 F.R.D. at 594–95. Under the present circumstances neither of these reasons is persuasive in terms of suggesting the need for better-informed representatives. Quite the contrary, to require in this case a higher level of factual knowledge than that possessed by the named plaintiffs would fail to serve in any way the goal of insuring adequate representation, and would unduly inhibit legitimate use of the class action device.

The alleged facts on which Count I is based concern the various retailers through which United marketed its property insurance, the racial composition of those retailers' customers, the comparative rates of claims made on insurance sold through the various retailers, the additional risk, if any, incurred by United in offering dual as opposed to single-interest insurance, and the extent to which any additional risks might justify higher premiums. Such information is indeed far-removed from the affairs of

everyday life. It would seem highly unlikely, to say the least, that Aronson's customers would have reasonable access to any of this information, much less enough of it so that they might perceive some indication of a subtle pattern of racial discrimination. The named plaintiffs were, on the other hand, of course aware of their individual dealings with Aronson. Additionally, they displayed awareness that this action concerned a charge of discriminatory pricing. This is in essence all they could be expected to know from their own experience and all it would be necessary to have them testify to. It cannot be said then, in any meaningful sense of the word, that there is a *need* for better-informed class representatives in order to provide counsel with additional information. Viewed from a slightly different perspective, to require a higher level of knowledge on the part of the named plaintiffs here would simply be to reward the defendants for allegedly having engaged in a more subtle form of discrimination than, say, openly refusing to rent apartments to racial minorities. While made in the context of an antitrust case the comments of the court in *Chevalier v. Baird Savings Assoc.*, 72 F.R.D. 140 (E.D.Pa.1976), are equally persuasive here:

> ". . . [I]t strikes us as at least partially unrealistic to expect the named plaintiffs to have any significant personal knowledge of the facts in a case like this, involving an antitrust conspiracy. This is something which, if it can be established, will only be done after a great deal of investigation and discovery by counsel against a background of legal knowledge. *See Bogosian v. Gulf Oil Corp.*, 337 F.Supp. 1234, 1235–36 (E.D.Pa.1972). To require the class representative to be sophisticated and knowledgeable enough to help counsel in this quest would reduce the class action device, especially in complicated antitrust cases, to an impotent tool. *Cf. La Mar v. H. & B. Novelty & Loan Co.*, 489 F.2d 461, 365–66 (9th Cir. 1973)." 72 F.R.D. at 146

As regards the need for a check on counsel's discretion in controlling the case, the comments of the *Baird* court are again persuasive:

> "There is no doubt that the named plaintiffs have a very sketchy view of what this litigation is all about. We also do not doubt that counsel are proceeding in this case without significant restraints from the named plaintiffs. Nevertheless, we cannot agree that this thereby renders a class action inappropriate."

. . . . .

> "The supposed unfettered discretion of counsel does not trouble us. Most lawyers, especially when representing unsophisticated litigants, have some degree of flexibility in their actions. Before counsel settle or dismiss this case, rule 23(e) requires our approval. Any fees to be paid counsel out of a monetary recovery would be awarded by the court, which has an obligation to protect the interests of the class members. *See In re Coordinated Pretrial Proceedings, Etc.,* 410 F.Supp. 680, 690 (D.Minn.1975). Further, if at any time we felt that counsel were not acting in the best interests of their clients, we would not hesitate to consider appropriate action pursuant to rule 23." 72 F.R.D. at 146, 147.

Moreover, it should be pointed out that in this case plaintiffs' legal-aid attorneys do not stand to make direct personal gains from the litigation.

Any lack of knowledge on the part of the present named plaintiffs, then, is not such as to adversely affect class members' interests. Still, United argues that under *Seiden v. Nicholson, supra,* they may not serve as representatives since they have displayed a "substantial lack of familiarity with the facts of the case." 69 F.R.D. at 688. The simple answer is that to whatever extent *Seiden* or other cases purport to offer such a test as one of universal applicability, they must here be rejected. It may be appropriate to require a class representative to possess roughly that understanding of the facts which could reasonably be expected of an individual in his position with relation to the events in issue. However, there are situations, such as this one, in

which a requirement of familiarity with the facts of the case as a whole is plainly unwarranted. *See Ste. Marie v. Eastern Railroad Ass'n.,* 72 F.R.D. 443, 448–49 (S.D.N.Y. 1976).

■ Finally, it is significant to note that defendants have not challenged the competence of counsel for the proposed class. Indeed, the record would indicate that counsel are experienced and capable in handling class actions similar to that present. This is plainly relevant because inquiries into the personal characteristics of the representatives and the professional competence of their counsel inevitably merge into the broader issue of whether the representatives and their counsel *together* will sufficiently serve the interests of absent class members.

Turning to the second element of adequate representation, defendants assert a number of antagonisms between the interests of the named plaintiffs and those of various other members of the proposed class.

■ First, it is urged that because the named plaintiffs were alleged by Aronson to have been in breach of their installment contracts, they, unlike other class members, may not have had any right to make claims under their insurance policies should a loss have occurred. This argument is simply irrelevant. While it is likely that such a distinction could be drawn between the named plaintiffs and certain other class members, this distinction does not reflect or correspond to any actual or potential line of friction between various class members' interests. Regardless of his ability to claim under the policy, each class member continues to have the same interest in recovering for an alleged overcharge in purchasing the insurance.

■ Second, it is argued that those class members who have received payments for losses under the dual-interest policies will,

if plaintiffs succeed on the merits, be subject to possible suit by Aronson for unjust enrichment. This argument is also meritless, for it is plaintiffs' theory that class members were entitled to receive the coverage they did, but at a lower, non-discriminatory rate. This is reflected in the fact that plaintiffs seek, as one aspect of the relief under Count I, to recover the amount by which the price charged for dual-interest insurance exceeded its fair market value.

■ Third, defendants emphasize that the proposed class under Count I is not defined in such a way as to include only Blacks and Hispanics and will therefore include Aronson's white customers as well. This, however, does not render the named plaintiffs inappropriate representatives. While the presence of whites and their relative number among the class members will no doubt be important in determining whether there has in fact been a practice of racial discrimination, no discrimination against whites *as such* is alleged. Since recovery by white class members can then only be based on a finding that they have suffered as the incidental victims of discrimination directed at Blacks and/or Hispanics,[6] the interests of the whites are inextricably bound to and consistent with those of the racial minority class members. Rule 23(a)(4) does not require that additional representatives be added or subclasses be created or that the class be narrowed simply because the class consists of members of different races. Only when such racial factions present a true potential for antagonism is Rule 23(a)(4) unsatisfied. *See Ellis v. Naval Air Rework Facility, Alameda, California,* 404 F.Supp. 391 (N.D.Cal.1975). Here, on the other hand, the named plaintiffs' interests are inseparable from those of any white class members.

All of the requirements of Rule 23(a) have then been satisfied.

---

**6.** Caselaw appears to support quite clearly the notion that whites who are the incidental victims of discrimination directed toward members of a minority racial group may themselves recover under 42 U.S.C. §§ 1981 and 1982 where rights protected by those provisions are implicated. *See, e. g., Faraca v. Clements,* 506 F.2d 956 (5th Cir. 1975); *Lamb v. Sallee,* 417 F.Supp. 282 (E.D.Ky.1976).

As regards Rule 23(b), plaintiffs assert that subdivisions (b)(2) and (b)(3) are applicable. This court finds certification under (b)(3) alone to be appropriate.

 In addition to the requirements stated in the rule itself [7] the Advisory Committee's Note accompanying the 1966 Amendment to Rule 23 provides the express caveat that "[Subdivision (b)(2)] does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." 39 F.R.D. 98, 102. *See Eisen v. Carlisle & Jacquelin,* 391 F.2d 555 (2nd Cir. 1968). It seems clear that the primary thrust of Count I is toward money damages. First, it does not appear that declaratory or injunctive relief could be required. Plaintiffs have sought relief under Count I in the form of (a) a declaration that defendants' selling practices have violated class members' rights under 42 U.S.C. §§ 1981 and 1982, (b) an injunctive against such continued violation of class members' right, (c) payment, to be distributed on a pro rata basis, of the amount by which charges for dual-interest insurance sold to class members exceeded the fair market value of such insurance, and (d) punitive damages. Judging from the complaint, though, it seems certain that none of the installment contracts in question are still in force; Count I alleges only that overcharges for insurance were made in Aronson installment contracts between April 1, 1971 and August 1, 1974. Nor is there any indication that any of the class members intend to deal with United or Aronson in the future. Further, the complaint states that prior to the filing of this action the Illinois Department of Insurance ordered United to "cease geographic discrimination" in the sale of insurance and to lower its dual-interest rate, and that on or about August 1, 1974 (the date on which the wrongful conduct alleged in Count I ended) United did lower that rate by 25%.[8]

 Secondly, plaintiffs seek punitive damages far in excess of the amounts sought to recover overcharges. Certification under subdivision (b)(2) should not be granted where substantial damages are sought in addition to final declaratory or injunctive relief. *Robertson v. National Basketball Ass'n,* 389 F.Supp. 867 (S.D.N.Y. 1975).

This court is aware that the recovery of alleged excess charges by class members is the type of equitable monetary relief which, being "incidental" to the requested injunctive relief, is permitted in (b)(2) suits, *see* 7A Wright and Miller § 1775, and that in Title VII cases, courts have permitted (b)(2) suits to proceed for such monetary relief (e. g. backpay) alone where changed circumstances have rendered injunctive relief unnecessary. *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239 (3rd Cir. 1975); *Arkansas Education Ass'n v. Board of Education,* 446 F.2d 763 (8th Cir. 1971). In dealing with the Advisory Committee's caveat the *Wetzel* court observed:

"Since a Title VII suit is essentially equitable in nature, it cannot be characterized as one seeking exclusively or predominantly money damages." 508 F.2d at 250–51.

In *Wetzel* and *Arkansas Education Ass'n,* however, no punitive damages were sought, and indeed most courts have held that puni-

---

**7.** Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the class as a whole."

**8.** Aside from these matters, it seems plain that even if an injunction is otherwise appropriate here, there is no need to certify a class for purposes of injunctive relief. Any injunction entered against United would be in the form of an order that it alter its policies with regard to the availability and/or pricing of insurance.

Such an injunction would necessarily inure to the benefit of all members of the proposed class to the same extent as a class-adjudicated injunction. The scope of the appropriate remedy would best be defined without reference to the class. Nor is there any need for class proceeding in order to insure the admissibility of all the evidence plaintiffs might seek to present. There is, then, no need for class adjudication regarding an injunction. *See Alliance to End Repression v. Rochford,* 565 F.2d 975 (7th Cir. 1977). 3B Moore's Federal Practice § 23.40 (1977–78 supplement, pp. 96–99).

tive damages, or even compensatory monetary relief of a non-equitable nature, cannot be granted under Title VII. *See Presseisen v. Swarthmore College,* 71 F.R.D. 34 (E.D. Pa.1976). Here on the other hand, the court must conclude that Count I is concerned predominantly, and from the outset, with money damages.

Turning to subdivision (b)(3), however, the court finds it to be applicable. Subdivision (b)(3) requires (1) that the questions of law or fact common to members of the class predominate over any questions affecting only individual members, and (2) that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Here, the common questions clearly predominate. Indeed, the only individual questions immediately foreseeable concern the amount of compensatory damages to be recovered by each class member should liability be established. Determination of such damages should be a relatively uncomplicated accounting procedure. In light of this, the first requirement of subdivision (b)(3) is satisfied. 7 Wright and Miller § 1778; *see e. g., Landau v. Chase Manhattan Bank,* 367 F.Supp. 992 (S.D.N.Y.1973). Finally, class adjudication is a superior to individual adjudication of the class members' claims. No unusual manageability problems appear to inhere in the size of the class or in other circumstances. Class determination seems particularly appropriate in view of the complexity of the proof required, the relatively limited size of each individual claim, and the likelihood that many class members would lack the initiative to press their claims. Accordingly, class certification under Rule 23(b)(3) will be granted.

### 2. The Motion to Dismiss or for Summary Judgment

United has moved to dismiss or for summary judgment on Count I. This motion is based on the logic that since plaintiffs have charged a "two-party scheme" under Count I and since, in their motion to dismiss Count I against Aronson, they represented to this court that it was "extreme-

ly unlikely" that Aronson's liability on that count could be proven, it would be "inequitable, unfair, and nonsensical" to allow plaintiffs to continue to proceed against United. Such an argument is meritless. The allegations against United extend beyond its activities in concert with Aronson; Aronson was simply cast as an instrumentality, albeit a willing one, by which United's discriminatory policies were put into effect. Even if it were assumed that there was in fact insufficient evidence to establish Aronson's liability on Count I, this would in no way suggest that United could not be found liable. Moreover, United does not suggest that the representations made in plaintiffs' motion have any value as an admission, or any estoppel effect.

### B. Count II

Rule 23(b)(1)—numerosity. It is undisputed that the class under Count II exists and consists of at least 346 members. The requirement that class members be too numerous for ordinary joinder is therefore satisfied. *See, e. g., Swanson v. American Consumer Indust. Inc.,* 415 F.2d 1326 (7th Cir. 1969).

Rule 23(b)(2)—commonality. Here, each class member's claim shares the questions whether the defendants did in fact base credit property insurance premiums on a total of payments which was higher than the cash price of the merchandise insured and whether, if they did, this violated Illinois law as a deceptive business practice.

Rule 23(a)(3)—typicality. Aside from the issues discussed below under subdivision (a)(4), no questions exist as to the typicality of Hernandez' claim. Indeed, except for the amount of compensatory damages sought, the claim of each class member would appear to be identical.

Rule 23(a)(4)—adequate representation. In this connection defendants argue that Hernandez cannot properly serve as a representative of the class because his own claim is time-barred. The logic of this view is that since Hernandez made the subject purchase from Aronson under a contract dated May 9, 1973, and since this action was not filed until July 19,

1976, the claim is barred by the three-year limitations period provided in Ill.Rev.Stat. ch. 121½ § 270a.[9] Such an argument must be rejected. In *Baker v. F & F Investment,* 420 F.2d 1191 (7th Cir. 1970) a class action was brought on behalf of Black purchasers of certain real estate alleging that the installment contracts under which the purchases were made contained terms less favorable than those available to whites. Violations of 42 U.S.C. § 1982, federal antitrust law, and Illinois antitrust law were charged. After finding that, under the circumstances, ruling on the limitations questions was not premature, the court addressed the matter as follows:

"After careful consideration, the district court concluded that the three statutes of limitations commenced running only upon the termination of the individual contracts. The court stated that the defendants 'are alleged to have been reaping the unlawful benefit through continuing enforcement of their unlawful scheme.' [*Contract Buyers League v. F. & F. Investment*] 300 F.Supp. [210] at p. 220 [D.C.1969]. We agree with this conclusion.

"Plaintiffs have alleged wrongs committed by defendants which continue during the entire lives of the individual purchase contracts. They have alleged a conspiracy among defendants, the object of which was the establishment of a continuing relationship with individual plaintiffs. That relationship, by the same token, constituted a prolonged and continuing invasion of the rights of the purchasers. As in *Hazeltine Research, Inc. v. Zenith Radio Corporation,* 418 F.2d 21 (7th Cir. 1969), the limitations periods commence to run from the last overt act of the conspiracy, permitting plaintiffs to recover 'for damages suffered within the damage period as a result of an overt act repetitious of the unlawful pre-[limitation] period acts occurring in the damage period' (418 F.2d at p. 25). Because of the continuing nature of the overt acts alleged, the statutes of limitations do not commence to run when the contracts were executed but when they terminate. *Hanover Shoe v. United Shoe Machinery Corp.,* 392 U.S. 481, 502, n. 15, 88 S.Ct. 2224, 20 L.Ed.2d 1231."
420 F.2d at 1200.

This court finds *Baker* to be controlling. Here, as in *Baker,* the complaint contains sufficient background for an immediate determination of the limitations issue. Moreover, the impact of *Baker* cannot be avoided by pointing out that formal allegations of conspiracy were involved, unlike in the present case. *Baker* makes clear that the contract itself constitutes a continuing invasion of plaintiffs' rights so long as it is in force, even where it is not alleged that the contract was the product of a conspiracy. It follows then in the present case that since it is undisputed that Hernandez continued to make payments on his contract beyond July 19, 1973, his claim was not time-barred. Also, this resolution of the limitations issue confirms the propriety of the class definition proposed by plaintiffs insofar as it is limited to purchasers whose contracts terminated on or after July 19, 1973.[10]

By way of its motion to dismiss or for summary judgment on Count II, United argues that the stipulation entered into between Aronson and the named plaintiffs constituted a release as to that count, operative in favor of United as a joint-tortfeasor. Because this agreement is relevant to the capacity of Hernandez to adequately represent the class, it should be discussed at this point.

Illinois law, which of course governs any issue as to a release of a claim

9. Ill.Rev.Stat. ch. 121½ § 270a(e) provides in relevant part:
 Any action for damages under this Section shall be forever barred unless commenced within 3 years after the cause of action accrued . . .

10. The same general analysis applies to the claims under Count I. Hence, since the five-year period of limitations provided in Ill.Rev. Stat. ch. 83 § 15 is to be applied in civil rights actions, *Beard v. Robinson,* 563 F.2d 331 (7th Cir. 1977), the class on Count I may properly include those purchasers whose contracts terminated on or after July 19, 1971. This would not appear to significantly limit the class as originally defined by the plaintiffs.

under that law, embodies a general rule that where a number of wrongdoers jointly cause an indivisible injury to the plaintiff a release of one wrongdoer releases the others. See *Cereal ByProducts v. Hall*, 16 Ill. App.2d 79, 147 N.E.2d 383 (1958). While it appears that this rule would be applicable here,[11] the stipulation in question cannot be viewed as a release. In determining whether an agreement constitutes a release so as to trigger the "release-one-release-all" rule, all of the circumstances are to be considered with a view toward enforcing the true intentions of the parties. See *Florkiewicz v. Gonzalez*, 38 Ill.App.3d 115, 347 N.E.2d 401 (1976); and see *Home Insurance Co. v. Hertz Corp.*, 71 Ill.2d 210, 16 Ill.Dec. 484, 375 N.E.2d 115 (1978). In the present case the stipulation, as it was cast in the form of a Rule 41 dismissal, does not contain formal language of release or covenant, and, is in general, somewhat vague as to the parties' intentions. However, in discussing provision for notice to class members so that they might make claims against the fund to be created by Aronson in settlement of Count II, the stipulation expressly provides that should a class be certified "against defendant United under Count I *and/or Count II* of the Second Amended Complaint" notice of the settlement fund would be made with any notice required for the classes certified against United. The second amended complaint names only Hernandez as class representative on Count II. Therefore, this provision of the agreement regarding notice clearly evidences the parties' intentions that Hernandez, as named plaintiff, would continue to pursue United under Count II. United's motion to dismiss or for summary judgment on Count II must then be denied.

Having dispensed with these arguments, the court finds that the interests of the named plaintiffs are not antagonistic to or conflicting with those of the other class members. Further, as in Count I, Hernandez, through his attorneys, appears likely to vigorously prosecute the class claims.

▮ As in Count I, certification under subdivision (b)(3) is proper. The relief sought under Count II includes an injunction, recovery of alleged overcharges, and punitive damages. Injunctive relief, at least on a class basis, appears unnecessary. Punitive damages are the predominant form of relief requested. However, common questions clearly predominate, and class adjudication will be superior to any alternative. Moreover, since individual notice will be required under Count I, it will place little additional burden on plaintiffs to include notice of Count II to those who are members of the class on that count.

C. *Conclusion.*

In summary then:

1. United's motions to dismiss or for summary judgment as to Counts I and II are denied.

2. As to Count I, named plaintiffs Ashford and Hernandez will represent a class of persons under Rule 23(b)(3) defined as all purchasers of United Fire Insurance Company dual-interest credit property insurance through Aronson Furniture Company at the rate of $4.00 per $100 of insured value per annum under contracts executed between April 1, 1971 and August 1, 1974 (and terminating on or after July 19, 1971).

3. As to Count II, named plaintiff Hernandez shall represent a class of persons under Rule 23(b)(3) defined as all purchasers of United Fire Insurance Company credit property insurance through Aronson Furniture Company under contracts executed between April 1, 1971, and August 1, 1974, and terminating on or after July 19, 1973, in which the credit property insurance premiums were based on the total of payments owing on the contracts, which total was initially greater than the cash price of the property purchased.

---

11. Plaintiffs' initial response to the defendants' argument is that United and Aronson are not to be viewed as "joint-tortfeasors", since the gist of Count II is an action in contract. Such a view seems illfounded. There is nothing in the Illinois cases which suggests that this rule is limited to defendants charged with common law torts. And, in any case, the Illinois Consumer Fraud and Deceptive Business Practices Act is essentially a codification of a body of the common law of fraud.

4. Certification of the classes under Counts I and II will be conditional, subject to this court's power at any time prior to final judgment to revoke or alter class certification in the interests of justice and to insure compliance with the requirements of Rule 23. Rule 23(c)(1); *Alliance to End Repression v. Rochford, supra,* 565 F.2d at 977.

And further, as it appears that the names and addresses (although somewhat old) of all class members can be obtained from United's records with reasonable effort, individual notice shall be given to each class member at the address of record in a form to be approved by the court. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Finally, since a list of these names and addresses is needed for purposes of giving notice, and since it will be no more difficult for plaintiffs, using United's records, to prepare such a list than it would be for United, plaintiffs are to prepare such a list, and will bear the full cost of doing so as well as the direct cost of giving the required notice. *See Oppenheimer Fund, Inc. v. Irving Sanders,* —— U.S. ——, 98 S.Ct. 2380, 57 L.Ed.2d 253, 1978.